**Timothy LEARY, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 23570.

United States Court of Appeals
Fifth Circuit.

Sept. 29, 1967.

Joel Jay Finer, Stanford, Cal., for appellant.

James R. Gough, Asst. U. S. Atty., Morton L. Susman, Ronald J. Blask, Asst. U. S. Atty., Houston, Tex., for appellee.

Before GEWIN and AINSWORTH, Circuit Judges, and LYNNE, District Judge.

AINSWORTH, Circuit Judge:

This unusual criminal case delves into the new realm of psychedelic experience, and into mysticism, religion and its free exercise. The principal issue we must decide is whether the conviction of appellant for violations of federal criminal statutes relating to marihuana—a psychedelic drug which the defendant claims he uses as a religious sacramental aid—contravenes the accused's First Amendment right to the free exercise of his religion. There are, however, other important questions, some of them constitutional also, which we will discuss fully.

Dr. Timothy Leary, appellant, and his minor daughter, Susan Leary, age 18, were jointly indicted on three counts for offenses pertaining to marihuana. Dr. Leary was tried before a jury on March

854

11, 1966. Count 1, which charged the smuggling of marihuana into the United States which should have been invoiced (declared), was dismissed by the court following a motion for judgment of acquittal. Dr. Leary was found guilty, however, on Count 2, which charged transportation, and facilitation of transportation, and concealment of marihuana after importation,[1] in violation of 21 U.S.C. § 176a,[2] and on Count 3, which charged transportation and concealment of marihuana by defendants as transferees, required to pay the transfer tax imposed by the Internal Revenue Code,[3] in violation of 26 U.S.C. § 4744(a) (2).[4] Appellant was sentenced to the maximum penalties and fines provided for such offenses, subject, however, to the provisions of 18 U.S.C. § 4208(b), and was

---

1. Count 2 of the indictment reads as follows:

 "*Count Two.* That on or about December 22, 1965, in the Laredo division of the Southern District of Texas, and within the jurisdiction of this Court, one TIMOTHY LEARY and one SUSAN LEARY, hereinafter called defendants, with intent to defraud the United States, did unlawfully and knowingly transport and facilitate the transportation and concealment of three (3) ounces of Marihuana (Cannabis Sativa), more or less, after importation, and the defendants then and there knew the said Marihuana to have been imported into the United States contrary to law, in violation of Section 176(a), Title 21, United States Code."

2. 21 U.S.C. § 176a provides:

 "Notwithstanding any other provision of law, whoever, knowingly, with intent to defraud the United States, imports or brings into the United States marihuana contrary to law, or smuggles or clandestinely introduces into the United States marihuana which should have been invoiced, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such marihuana after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or whoever conspires to do any of the foregoing acts, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. * * *

 "Whenever on trial for a violation of this subsection, the defendant is shown to have or have had the marihuana in his possession, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains his possession to the satisfaction of the jury."

 (No suspension of sentence, probation or parole is allowed as to a conviction for this offense. See 26 U.S.C. § 7237 (d).)

3. Count 3 of the indictment reads as follows:

 "*Count Three.* That on or about December 22, 1965, in the Laredo Division of the Southern District of Texas, and within the jurisdiction of this Court, one TIMOTHY LEARY and one SUSAN LEARY, transferees, required to pay the transfer tax imposed by the Internal Revenue Code, did unlawfully and knowingly transport, conceal and facilitate the transportation and concealment of a quantity of Marihuana, to-wit: approximately three (3) ounces of Marihuana (Cannabis Sativa) without having paid the transfer tax imposed by said code, in violation of Section 4744 (a) (2), Title 26, United States Code."

4. 26 U.S.C. § 4744(a) (2) provides:

 "It shall be unlawful for any person who is a transferee required to pay the transfer tax imposed by section 4741(a)—

 (1) to acquire or otherwise obtain any marihuana without having paid such tax, or

 (2) to transport or conceal, or in any manner facilitate the transportation or concealment of, any marihuana so acquired or obtained.

 "Proof that any person shall have had in his possession any marihuana and shall have failed, after reasonable notice and demand by the Secretary or his delegate, to produce the order form required by section 4742 to be retained by him shall be presumptive evidence of guilt under this subsection and of liability for the tax imposed by section 4741(a)."

 26 U.S.C. § 7237 provides for a maximum fine of $20,000 and imprisonment of ten years for a first offense in violation of 26 U.S.C. § 4744(a) (2).

 The rate of the special tax on marihuana is provided for in 26 U.S.C. § 4741. The written order form required of the transferee of marihuana is set forth in 26 U.S.C. § 4742.

ordered committed to the medical center at Springfield, Missouri, for a complete study [5] to be used by the court as a basis for determining the ultimate sentence in the case. Defendant's motion for a new trial was denied.

Susan Leary was tried at the same time as her father, Dr. Leary, by the court without a jury (trial by jury having been waived) and found guilty on Count 3 of the indictment but not guilty on Counts 1 and 2. Imposition of sentence was suspended and she was placed on probation during the remainder of her minority, without supervision, under the provisions of the Youth Corrections Act, 18 U.S.C. § 5010(a). Her appeal was then dismissed on her own motion.

The facts of this case are relatively uncomplicated.

Dr. Leary left New York on December 20, 1965 by automobile, accompanied by his two children, Susan, age 18, and John, age 16, and two other persons. Their destination was Yucatan, Mexico, and the alleged purpose of the trip was a Christmas vacation for the Leary children and to provide Dr. Leary the opportunity to write a book and to prepare for a summer session to be conducted with a research group at his home in Millbrook, New York. On December 22, 1965, Dr. Leary and the four passengers drove across the international boundary at Laredo, Texas, into the Republic of Mexico, stopped at the Mexican immigration station for several minutes, and turned back toward the United States. At approximately 6:45 p. m., they arrived at the secondary inspection area, Laredo International Bridge, Laredo, Texas. Dr. Leary, the driver of the vehicle, told a U. S. Customs official that they had driven across the boundary into Mexico within the prior hour, that they had been unable to secure tourist permits and had been told by Mexican immigration officials to return the following morning at 8:00 a. m. at which time the necessary Mexican permits would be given to them. The U. S. inspector asked the group if they had anything to declare

5. 18 U.S.C. § 4208 provides in pertinent part that

"(b) If the court desires more detailed information as a basis for determining the sentence to be imposed, the court may commit the defendant to the custody of the Attorney General, which commitment shall be deemed to be for the maximum sentence of imprisonment prescribed by law, for a study as described in subsection (c) hereof. The results of such study, together with any recommendations which the Director of the Bureau of Prisons believes would be helpful in determining the disposition of the case, shall be furnished to the court within three months unless the court grants time, not to exceed an additional three months, for further study. After receiving such reports and recommendations, the court may in its discretion: (1) Place the prisoner on probation as authorized by section 3651 of this title, or (2) affirm the sentence of imprisonment originally imposed, or reduce the sentence of imprisonment, and commit the offender under any applicable provision of law. * * *

"(c) Upon commitment of a prisoner sentenced to imprisonment * * * the Director, under such regulations as the Attorney General may prescribe, shall cause a complete study to be made of the prisoner and shall furnish to the board of parole a summary report together with any recommendations which in his opinion would be helpful in determining the suitability of the prisoner for parole. This report may include but shall not be limited to data regarding the prisoner's previous delinquency or criminal experience, pertinent circumstances of his social background, his capabilities, his mental and physical health, and such other factors as may be considered pertinent. The board of parole may make such other investigation as it may deem necessary."

The court ordered that the sentences imposed be consecutive and the fines cumulative (amounting to a total of 30 years and $40,000). The district judge of course is awaiting the outcome of this appeal, and upon our affirmation, under the provisions of 18 U.S.C. § 4208(b) may, in his discretion, reduce the term of imprisonment or place the appellant on probation under Count 3 and reduce the sentence of imprisonment under Count 2.

However, conviction under 21 U.S.C. § 176a requires a mandatory sentence of five years, and under 26 U.S.C. § 7237 there can be no suspension of sentence or probation for such conviction.

from Mexico and was told that they had not. After the occupants alighted from the vehicle, the U. S. inspector observed some vegetable material and a seed on the floor of the automobile which appeared to him to be marihuana. Thus the five travelers were arrested. A search of the baggage, the vehicle and of the individuals was made. Sweepings from the car floor and glove compartment were later proved to be marihuana.[6] While Dr. Leary was being searched, he stated that he had never used marihuana. A woman Customs inspector performed a personal search of the two female travelers, which resulted in the finding of a small metal container on the person of Susan Leary after she had disrobed. Within the container were three partially smoked marihuana cigarettes, a small quantity of semi-refined marihuana and capsules of detroamphetamine sulfate (said to be a nonprohibitive narcotic). Demand was made of Dr. Leary for the required Treasury Lepartment transferee form. He stated that he had no such form. Susan Leary, in response to the same demand, refused to make any statement. Dr. Leary admitted to a U. S. Customs agent that the metal box taken from his daughter, Susan, containing the marihuana, was his property. He further stated in the presence of two Government agents that he knew more about narcotics and marihuana than either of them.

Dr. Leary testified on his own behalf. He admitted that the seized marihuana had been obtained by him in New York and had been in his possession continuously on his trip from New York to Laredo; that he had neither obtained an order form nor paid a transfer tax for the marihuana as required by the statute. He said that he asked the four people in his group to get rid of the marihuana; that just prior to arriving at the U. S. Customs Station, while crossing the International Bridge, he asked if the marihuana had been disposed of and was told by Susan, his daughter, that it had not been and it was in her possession. He further admitted that while on the trip from New York to Mexico at an overnight stop in New Orleans, Louisiana, he smoked marihuana to relieve a low spiritual state; that this incident was equivalent to an hour of silent meditation from which he derived spiritual benefit. Dr. Leary testified that he was familiar with the laws of the United States relative to marihuana and was aware that his actions were contrary to such laws.[7] In his testimony he attempted to justify use of this drug which he said was for religious and scientific purposes.

Dr. Leary has an impressive academic background. He testified that he received a Ph. D. degree in Clinical Psychology from the University of California. During the years from 1944 to 1960 he wrote and published several publications relative to the use of psychedelic drugs in the treatment of the mentally ill, including thirteen scientific articles and two books. In 1950 he helped found the Kaiser Psychiatric Clinic in Oakland, California. During the next eight years he received nearly one-half million dollars in federal grants at the Kaiser Clinic for research work on mental illness. He published four diagnostic tests relative to mental illness which have been used in diagnosing and treating mental patients in over 750 clinics and hospitals in the United States and which have been translated into several foreign languages. He served on the University of California medical faculty from 1953 to 1956.

6. The indictment refers to three ounces of marihuana. Analysis and weighing of the seized material disclosed that a total of a little less than one half of an ounce had been found and confiscated.

7. Dr. Leary was questioned by the court as follows:

"The Court: I take it that you make—that you do not deny that you have recognized all the time that the transportation and the use, and so forth, of this marihuana is contrary to the laws of the United States?

"The Witness: Yes, sir. I know they are contrary to the laws of the United States."

In 1959 he joined the Harvard University faculty.

In 1960, while visiting Mexico, he testified that he had "the most intense religious experience" he had ever had in his life as the result of having eaten a number of the "Sacred Mushrooms" of Mexico. The incident changed his life. Since that time he has written five books and thirty-eight articles pertaining to religious and scientific use of psychedelic drugs, and he has devoted his life to attempting to understand the religious experience and how it can be applied to help others. He said that he formed a religious research group after returning to Harvard University, and with the help of Aldous Huxley, he experimented with certain psychedelic drugs. In 1962 he studied Hinduism and after a year became a member of a Hindu sect. In 1963 he left Harvard, performed further experimental work in Mexico, and later established a center and workshop for religious and scientific research in Millbrook, New York, which center is now his home. The building also serves as a place for religious meditation and spiritual retreat. Rooms in the house contain shrines devoted to Hindu, Buddhist and Christian ways of finding God, as well as religious pictures and statues. Dr. Leary has traveled extensively through Asia in pursuit of his religious endeavors and has studied Buddhism and Hinduism with several religious teachers and monks. While studying in India with Sri Asoke Fukir, a religious leader, Dr. Leary participated in religious rituals in which marihuana was used. He was converted to Hinduism, and is now a member of the Brahmakrishna sect in Massachusetts.

Dr. Leary further testified that he first used marihuana in August or September 1964. Marihuana enables him to attain what he describes as the third level of consciousness. Other psychedelic drugs take a person to a higher level. According to the Hindu religion, there are thousands of roads to illumination to the god within a person. Different sects specialize in different aids. The Hindu sect in India of which he became a member uses marihuana for religious illumination and meditation. He ordinarily uses marihuana less than once a week and then only for religious purposes. He draws no distinction between his religious beliefs and his scientific experimentation. If he could not use marihuana it would not affect his religious beliefs but he would consider it a violation of those beliefs and practices if he were denied its use.

Dr. Leary said he acquired the marihuana in New York which led to his conviction. He testified that the reason he did not declare the marihuana at the U. S. Customs Office at Laredo was his apprehension of being subjected to investigation or arrest. He never complied with the Treasury Department regulations relative to marihuana because he knew that he could not obtain permission for its use inasmuch as his research is not performed in a laboratory and is of a religious nature; that the law makes no provision for the use of marihuana under such circumstances; that if he had attempted to register or to pay the required tax, the marihuana would have been taken from him and he would have been subjected to legal action. He had applied for and been refused permits for other chemicals such as mescaline, peyote and LSD. He believes he has both a moral and a political right to possess marihuana.

Fred Swain (Sri Kalidas, in religion) testified on behalf of appellant. He is an American Hindu Sanyasa (monk), a renunciant, living in a monastery, who joined the religious order of which appellant is a member in 1948. He met Dr. Leary in 1962 and later participated in psychedelic experiments with him at Harvard University. While traveling in India he was often in the company of Dr. Leary; he smoked marihuana with him in the Rishikesh, a city of holy men, along the banks of the Ganges River, in Hindu religious services. He said that marihuana plays a very important part in the rituals of the Hindu sect conducted by Sri Asoke Fukir in India.

The Brahmakrishna sect in the United States of which he and Dr. Leary are members is a highly established authority sect in India, recognized throughout India by all Hindus. He admitted that he was partially able to achieve and practice his religious beliefs in the Hindu sect without the use of marihuana. He does not use marihuana in the United States because it is unavailable; he is forced to use other psychedelic drugs in conjunction with meditation and prayer.

Dr. Ralph Metzner, a psychopharmacologist who received his Master's degree from Oxford and Ph. D. in Psychology from Harvard, testified on behalf of appellant. He co-authored with Dr. Leary the book "Psychedelic Experience" as well as several articles including "Reducing Criminal Behavior" by the use of the psychedelic drug psilocybin (the extract of the sacred mushroom). The word "psychedelic" refers to a class of drugs, which includes LSD, mescaline, marihuana, among others, whose primary effect is to expand consciousness, heighten intellectual activity and sensory awareness. In India he was initiated into the same Hindu sect of which Dr. Leary is a member. He participated with Dr. Leary in several scientific experiments under the auspices of Harvard University. He also assisted Dr. Leary in conducting seminars, giving lectures, writing books and giving training courses in consciousness expansion without drugs. He corroborated Dr. Leary's testimony concerning the religious nature and character of the Millbrook center in New York.

Appellant's points of error are stated substantially as follows:

1 (A). The District Court erred in refusing to instruct the jury to acquit appellant if it found his religious claims to be honest and in good faith.

1 (B). In light of the federal exemption from restrictive legislation granted to religious users of peyote and the Government's inability to establish that marihuana is more harmful than peyote, the denial of a religious exemption from the marihuana legislation is an invidious religious discrimination in violation of the First and Fifth Amendments.

2. Denial of appellant's motions for a bill of particulars specifying the location, direction and time of alleged transportation was reversible error; alternatively, the indictment was fatally insufficient.

3. The District Court's instructions on the meaning of the statutory presumptions (a) effectively directing conviction and imposed upon appellant the burden of proving his innocence; (b) were misleading and authorized convictions if appellant did not prove to the jury's "satisfaction" that his possession was "lawful" and "legitimate"; and (c) failed to direct acquittal if the jury believed that appellant lacked knowledge of illegal importation—all in violation of the Fifth and Sixth Amendments and amounting to "plain error" under Rule 52(b), Fed. R.Crim.P.

4. The Government's closing argument to the jury far exceeded the bounds of fair comment.

5. The Government's failure to disclose that one of the major witnesses was under two federal indictments at the time of the trial denied appellant a fair trial.

6. The presumption under 21 U.S.C. § 176a that marihuana is illegally imported and that a possessor has knowledge of illegal importation is arbitrary and irrational in view of the high proportion of marihuana in the United States which is domestically grown.

7. The statutory requirement of a written order form (26 U.S.C. § 4742) and the imposition of a transfer tax (26 U.S.C. § 4741(a)) violate appellant's

---

8. Out of the presence of the jury Dr. Metzner testified at length that marihuana was a mild, relatively harmless and non-addictive drug. Dr. Joe Fort, medical doctor with special training in psychiatry and drug addiction, also testified out of the presence of the jury substantially to the same effect.

constitutional privilege against compulsory self-incrimination and render invalid the conviction under Count 3.

8. The District Court erred in refusing to instruct the jury that they could consider as a defense to Count 2, the defendant's honest and sincere belief that he had a right to engage in his activities because of his religious, scientific, or parental beliefs, and that these beliefs could negate the specific intent necessary for conviction under the statute.

Religious freedom, guaranteed by the Constitution, must be weighed with the public interest and the broad power to legislate vested in Congress by the Constitution.[9] Thus the First Amendment "embraces two concepts,— freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." Cantwell v. State of Connecticut, 310 U.S. 296, at 303, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The freedom to act is conditional and relative and Congress may prescribe and enforce certain conditions to control conduct which may be contrary to a person's religious beliefs in the interest of the public welfare and protection of society. See the Supreme Court's decisions in the anti-bigamy cases, Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878); Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890), and the Sunday-closing-law cases, McGowan v. State of Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Two Guys From Harrison-Allentown v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961); Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); Gallagher v. Crown Kosher Super Mkt. of Mass., 366 U.S. 617, 81 S.Ct. 1122, 6 L.Ed.2d 536 (1961).

In Reynolds v. United States, supra, 98 U.S. at 166, the Supreme Court, in denying Mormons an exemption from anti-bigamy laws, said, "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices." The Court recognized that religious practice could not be accepted as justification for an overt criminal act; that to permit a man to excuse his unlawful practices because of his religious belief "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." (98 U.S. at 167.)

In Braunfeld v. Brown, supra, which upheld the constitutional validity of a Pennsylvania Sunday-closing statute, the Court reaffirmed the principles of Cantwell v. State of Connecticut, supra, and Reynolds v. United States, supra, with its statement that "the freedom to act, even when the action is in accord with one's religious convictions, is not totally free from legislative restrictions" (366 U.S. at 603, 81 S.Ct. at 1146), and that "legislative power over mere opinion is forbidden but it may reach people's actions when they are found to be in violation of important social duties or subversive of good order, even when the actions are demanded by one's religion." (366 U.S. at 603, 604, 81 S.Ct. at 1146).[10]

Congress has seen fit to legislate, with appropriate criminal sanctions, concerning the possession, importation, concealment, and taxation of marihuana. The severity of the penalties provided by statute for the violation of these laws provides an insight into the grave concern of Congress to control the use of this drug. The testimony of appellant's

9. See Art. I, Sec. 8, United States Constitution; Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development, Part I. The Religious Liberty Guarantee, 80 Harv.L.Rev. 1381 at 1390 (1967).

10. See also Davis v. Beason, 133 U.S. 333, 342–343, 10 S.Ct. 299, 301, 33 L.Ed. 637 (1890), in which the Supreme Court said: "However free the exercise of religion may be, it must be subordinate to the criminal laws of the country, passed with reference to actions regarded by general consent as properly the subjects of punitive legislation."

witnesses relative to his sincerity of purpose in his religious and scientific endeavors is not pertinent here; nor is the evidence about the so-called harmless nature, the therapeutic value, and the accepted use of marihauna for religious rituals by certain sects in India.

██ Our concern is with the laws of the United States, which appellant admittedly, knowingly and purposely violated because they conflicted with his personal religious beliefs and practices. Appellant has attempted to demonstrate that the experience he finds through the use of marihuana is the essence of his religion. We do not inquire into the truth or verity of appellant's religious beliefs —to do so would be violative of the Free Exercise Clause of the First Amendment. United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). But appellant's religious creed and the sincerity of his beliefs are not at issue here. The district judge properly refused an instruction to the jury that they should acquit the defendant if they found his religious practices were in good faith.

Appellant's reliance on Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), for authority that the constitutionally guaranteed right of free religious exercise imposes on the Government the burden of showing a compelling interest in its abridgement, is misplaced and inapposite on the facts. In *Sherbert* the Supreme Court held that the disqualification of a member of the Seventh Day Adventist Church for unemployment benefits under the South Carolina Unemployment Compensation Act, because of her refusal to work on Saturday, imposed a burden on the free exercise of her religion. The Court in arriving at its conclusion considered whether there was "some compelling state interest" in the statute which justified "the substantial infringement of appellant's First Amendment right" (374 U.S. at 406, 83 S.Ct. at 1795), and found no such state interest.

Here the paramount Government interest in the enforcement of the laws relative to marihuana is the protection of society. We cannot reasonably equate deliberate violation of federal marihuana laws with the refusal of an individual to work on her Sabbath Day and nevertheless claim compensation benefits. The Court in *Sherbert,* while upholding the Free Exercise Clause under the facts of that case, recognized that it had rejected challenges under the same clause "to governmental regulation of certain overt acts prompted by religious beliefs or principles, for 'even when the action is in accord with one's religious convictions, [it] is not totally free from legislative restrictions.' Braunfeld v. Brown, 366 U.S. 599, 603, 81 S.Ct. 1144, 1146, 6 L.Ed.2d 563. The conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order. See, e. g., Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244; Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643; Prince v. [Commonwealth of] Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645; Cleveland v. United States, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12." (374 U.S. at 403, 83 S.Ct. at 1793.)

The unlawful transportation, possession and use of marihuana falls within the category of cases cited in *Sherbert* which require governmental regulation. "Crime is not the less odious because sanctioned by what any particular sect may designate as 'religion.'" Davis v. Beason, 133 U.S. 333, 345, 10 S.Ct. 299, 301, 33 L.Ed. 637 (1890).

There is no evidence in this case that the use of marihuana is a formal requisite of the practice of Hinduism, the religion which Dr. Leary professes. At most, the evidence shows that it is considered by some as being an aid to attain conciousness expansion by which an individual can more easily meditate or commune with his god. Even as such an aid, it is not used by Hindus universally.

██ Congress has made it a crime to traffic in marihuana and it was not incumbent upon the Government to produce evidence to controvert the testimony of witnesses on the controversial question whether use of the drug is relatively

harmless. Thus the question is whether the conduct or action so regulated and prohibited under severe criminal penalties by Congress (i. e., trafficking in marihuana) has posed "some substantial threat to public safety, peace or order," *Sherbert*, supra, 374 U.S. at 403, 83 S.Ct. at 1793. Congress has demonstrated beyond doubt that it believes marihuana is an evil in American society and a serious threat to its people. It would be difficult to imagine the harm which would result if the criminal statutes against marihuana were nullified as to those who claim the right to possess and traffic in this drug for religious purposes. For all practical purposes the anti-marihuana laws would be meaningless, and enforcement impossible. The danger is too great, especially to the youth of the nation, at a time when psychedelic experience, "turn on," is the "in" thing to so many, for this court to yield to the argument that the use of marihuana for so-called religious purposes should be permitted under the Free Exercise Clause. We will not, therefore, subscribe to the dangerous doctrine that the free exercise of religion accords an unlimited freedom to violate the laws of the land relative to marihuana.

██ Appellant argues that the religious use of peyote, a psychedelic hallucinogen, by Indians who are members of the Native American Church has been constitutionally protected by the Supreme Court of California in People v. Woody, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964). He refers also to the California Supreme Court's decision in In re Grady, 61 Cal.2d 887, 39 Cal.Rptr. 912, 394 P.2d 728 (1964), decided the same day as *Woody,* in which conviction of a "self-styled peyote preacher" for unlawful possession of narcotics, namely, peyote, was annulled and a new trial

granted in order that the defendant might have an opportunity to prove that his use of peyote was in connection with an honest and bona fide practice of a religious belief. By parity of reasoning he contends that marihuana, another psychedelic drug, is entitled to the same constitutional protection as peyote. With due deference to the California Supreme Court, we are of course not bound by its decisions. However, we note an essential difference between *Woody* and the instant matter in that peyote in the *Woody* case played "a central role in the ceremony and practice of the Native American Church, a religious organization of Indians," and that the "ceremony marked by the sacramental use of peyote, composes the cornerstone of the peyote religion." Grady was apparently the spiritual leader of a group of individuals and provided peyote for the group which he said was for religious purposes.

██ We are not impressed that the California cases are directly in point, and we will not apply them insofar as the circumstances of this case are concerned.[11]

In the early case of State v. Big Sheep, 75 Mont. 219, 243 P. 1067 (1926), the Montana Supreme Court held, "It was clearly within the power of the Legislature to determine whether the practice of using peyote is inconsistent with the good order, peace, and safety of the state," against the contention that the defendant's religious freedom was infringed.

In State v. Bullard, 267 N.C. 599, 148 S.E.2d 565, 569 (1966), the North Carolina Supreme Court held, "The defendant may believe what he will as to peyote and marijuana and he may conceive that one is necessary and the other is advisable in connection with his religion. But

---

11. The Federal Commissioner of Food and Drugs has exempted peyote from use in bona fide religious ceremonies of the Native American Church, 21 C.F.R., Part 166.3(c). But this would hardly justify our holding, as appellant contends, that the criminal statutes against marihuana are unconstitutional because of religious discrimination. The exemption accorded the use of peyote in the limited bona fide religious ceremonies of the relatively small, unknown Native American Church is clearly distinguishable from the private and personal use of marihuana by any person who claims he is using it as a religious practice.

it is not a violation of his constitutional rights to forbid him, in the guise of his religion, to possess a drug which will produce hallucinatory symptoms similar to those produced in cases of schizophrenia, dementia praecox, or paranoia, and his position cannot be sustained here—in law nor in morals."

 The District Court denied appellant's request for a bill of particulars which sought information to ascertain whether it was the Government's intention to rely on his possession of marihuana prior to entry into Mexico or following importation into the United States from Mexico, and whether it was the Government's contention that he was guilty of the overt act of smuggling. The smuggling count was withdrawn from the jury by the court so we turn our attention to Count 2, which charges appellant with transportation and concealment of marihuana after knowledge of importation, and Count 3, which charges transportation and concealment without having paid the necessary transfer tax. Appellant stated that the information requested was necessary to prepare an adequate defense and to avoid the possibility of double jeopardy. Appellant further contended that depending on the theory of the prosecution, different legal defenses would arise, and the requested information was necessary to decide whether he should exercise his right to testify. From a reading of Counts 2 and 3 we conclude that they are not duplicitous. Each count states the date and the place of the offense and adequately apprises appellant of the nature of the offense charged. Granting or denial of a bill of particulars is a matter within the sound discretion of the trial judge, and will not be interfered with on appeal unless there is abuse or prejudice. Joseph v. United States, 5 Cir., 1965, 343 F.2d 755; Robertson v. United States, 5 Cir., 1959, 263 F.2d 872; Johnson v. United States, 5 Cir., 1953, 207 F.2d 314. There was no such abuse or prejudice here.

 Appellant contends, alternatively, that the indictment in this case is fatally insufficient. In this Circuit's decisions in Thomas v. United States, 314 F.2d 936 (1963), and Marquez-Anaya v. United States, 319 F.2d 610 (1963), the defendants were charged with smuggling marihuana and with transportation of the drug without having paid the necessary tax thereon. Proof was adduced by the Government that the marihuana had been obtained by the defendants in Mexico. The court held in *Thomas,* and reiterated in *Marquez-Anaya,* that an indictment charging transportation and concealment of marihuana without having paid the transfer tax was necessarily predicated upon the defendants having obtained the drug within the United States, and because of the Government's proof to the contrary, that is, that the marihuana had been smuggled by the defendants into the United States from Mexico, the conviction under the tax count could not stand. However, the instant matter is clearly distinguishable from our holdings in *Thomas* and *Marquez-Anaya.* Here, as the case developed, the Government's evidence (through testimony of United States Customs Agent Hatch of statements made to him by the accused) showed that the marihuana was acquired by defendant in the United States. Dr. Leary's own testimony later in the trial was to the same effect and the district judge consequently withdrew the smuggling count from the jury's consideration. The defendant admitted all of the elements of Count 2 except knowledge of importation. The Government, supported by appellant's own testimony, proved the elements of transportation and concealment of the drug under Count 2, although under the statute it was incumbent on it merely to show possession in order to authorize conviction unless the defendant explained his possession to the satisfaction of the jury. Appellant admitted transporting the marihuana from New York and crossing and recrossing the international border between the United States and Mexico with the marihuana in his possession. He made no effort to explain his possession of the illegal drug to the jury beyond his

defense that use of marihuana was a sacramental aid in the practice of his religion—an explanation we have already pointed out is insufficient and immaterial. In addition to the facts proved by the Government, conviction on Count 3 was also justified by appellant's own testimony—his candid admission that he had never paid the required tax as a transferee. The counts were, therefore, neither inconsistent within themselves nor with each other.

■ There is likewise no merit to appellant's argument that the court's instructions implied that possession, not satisfactorily explained, *compelled* conviction. The court assiduously avoided such an instruction. At the outset the trial judge explained the presumption of innocence which attaches to every defendant brought to trial in a criminal case. He instructed the jury that the Government must prove the accused's guilt beyond a reasonable doubt and de-

fined that term. The district judge quoted the exact provision of the statutory inference in 21 U.S.C. § 176a, i. e., "such possession shall be deemed sufficient evidence as to *authorize* conviction unless the defendant explains his possession to the satisfaction of the jury," (emphasis added), and explained its meaning in the language of the statute by stating: "That means, unless he proves to your satisfaction that it was a lawful and a legitimate possession of the marihuana he had." The court clearly and adequately defined the terms "unlawfully," "knowingly," and "with intent to defraud" and twice repeated the necessity of the jury finding such elements beyond a reasonable doubt to warrant conviction. The jury was advised of its affirmative duty to acquit in the absence of such findings. We do not construe the court's instructions as *requiring* conviction on evidence of possession of marihuana, but only as *authorizing* it.[12] Appellant's argument

---

12. Pertinent parts of the judge's instructions to the jury on this question are quoted as follows:

"Now, I instruct you, ladies and gentlemen, that this defendant, as is true of every defendant brought to trial in this court, is presumed at the outset to be innocent.

"The defendant starts off with a clean slate, and by pleading 'Not Guilty,' as he has done here, has imposed upon the Government to prove his guilt to you beyond a reasonable doubt.

"By the term 'reasonable doubt' as I use it here, is meant such a doubt as may arise in your minds when, after fully and impartially considering all of the evidence, the jurors do not feel satisfied to a moral certainty of the accused's guilt.

"A 'reasonable doubt' does not mean a mere possible or imaginary doubt or a mere conjecture; a 'reasonable doubt' is one which appeals to and is based upon your reason.

"If after fully and impartially considering all of the evidence you have a reasonable doubt as to the guilt of the defendant, it's your duty to acquit.

"On the other hand, if after fully and impartially considering all of the evidence you are convinced beyond a reasonable doubt of the guilt, then it's your duty to convict." (R. 591, 592.)

\* \* \* \* \*

"Now, I want to read the statutes to you which the defendant is alleged to have violated.

"Section 176a of Title 21 of the United States Code, in pertinent part, reads as follows:

"Notwithstanding any other provision of law, whoever knowingly, with intent to defraud the United States, imports or brings into the United States marihuana contrary to law, or smuggles or clandestinely introduces into the United States marihuana which should have been invoiced—

"Now, that has to do with Count 1, which I am withdrawing from your consideration.

"'\* \* \* or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment or sale of such marihuana after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, shall be punished as the statute thereafter provides.

"With the further paragraph:

"Whenever on trial for a violation of this subsection, the defendant is shown to have or to have had marihuana in his possession, such possession shall be deemed sufficient evidence as to authorize conviction unless the defendant ex-

is, therefore, untenable, especially since he did in fact testify that he knew that his actions were contrary to the laws of the United States.

Appellant contends that the closing arguments to the jury by Government counsel far exceeded the bounds of fair comment, invited prejudice based on educational, economic and regional differences between the accused and the jurors, expressed strong hostility toward him, asserted that he was irresponsible regarding his child's welfare, attacked him for offering a religious defense, bolstered a witness' credibilty and generally inflamed the jury's emotions, amounting to plain and reversible error. Pertinent parts of the arguments to which objections were made are set forth more fully in the margin below, [13] but they refer principal-

plains his possession to the satisfaction of the jury.

"What that means, of course, is this:

"If the defendant be shown to have had the marihuana in his possession in the United States, such possession shall be deemed sufficient evidence to authorize conviction unless he explains his possession to the satisfaction of the jury. That means, unless he proves to your satisfaction that it was a lawful and a legitimate possession of the marihuana which he had.

"The other statute alleged to have been violated is 4744(a) (2) of Title 26 of the Code, reading in pertinent part as follows:

"It shall be unlawful for any person who is a transferee required to pay the transfer tax imposed by Section 4744(a) (1) to acquire or otherwise obtain any marihuana without having paid such tax or, to—and this is the part that we are interested in—to transport or conceal or in any manner facilitate the transportation or concealment of any marihuana so acquired or obtained. Proof that any person shall have in his possession any marihuana and shall have failed after reasonable notice and demand by the Secretary or his delegate to produce the order form required by Section 4742 to be retained by him, shall be presumptive evidence of guilt under this subsection." (R. 595–598.)

\* \* \* \* \*

"And the statute which I have read to you with regard to this third count provides that failure to produce the order form shall be presumptive evidence of guilt under this subsection.

"Now, you might have some difficulty with the question on Count 2 by reason of the fact that the statute requires that the defendant receive—by reason of the fact that the statute provides that one who receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment or sale of such marihuana, after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, shall be punished as the statute provides.

"The Government is entitled to rely upon the presumption which I read to you earlier; that is, whenever on trial for a violation of this subsection the defendant is shown to have or to have had the marihuana in his possession, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains his possession to the satisfaction of the jury.

"I mention this a second time because you might be confused about the question of importation.

"We are not talking necessarily about the importation or what the Government contends was importation here at the bridge.

"The defendant has told us that he received the marihuana in New York. This statute, of course, is of application throughout the land and the presumption would still apply that the narcotic had been imported illegally and that he knew it had been imported illegally unless he explains his possession to the satisfaction of the jury." (R. 608–610.)

13. The following is taken from the final argument of Government counsel to the jury:

"And all this other stuff, I submit, is just hogwash. It's just an attempt to come down here to Laredo, Texas and get a federal jury to believe that because he has got a Ph. D. and because he has got a 3,000-acre mansion in Upper New York where they experiment all the time, that he is not subject to the laws of the United States of America.

"And I say to you respectfully and sincerely that is not but hogwash, that Dr. Leary, like everybody else, high, low, black, white—any color—are subject to the laws equally, of the United States. That is one thing that we have that many people in the world do not have. We have a country of law. We are governed by law and we all are subject to the same rules, rich, poor, race,

ly to the prosecutor's statements that appellant was "irresponsible" (especially with reference to the welfare of his children), his defense was a "colossal hoax," "just hogwash," to Government counsel's statement that "I cannot remember a case I have felt more strongly about than I have this case," and his further statement that "I don't mean to shout, for shouting's sake, but I feel so strongly about this case and his acts that I can't help myself."

The record discloses that no objection to the remarks of the prosecution was made by the several defense counsel either during or after the argument. The issue was, therefore, waived at the time of trial by the defense. See Fogarty v. United States, 5 Cir., 1959, 263 F.2d 201, cert. den. 360 U.S. 919, 79 S.Ct. 1437, 3 L.Ed.2d 1534; Van Nattan v. United States, 10 Cir., 1966, 357 F.2d 161; United States v. Sawyer, 4 Cir., 1965, 347 F.2d 372; United States v. Aadal, 2 Cir., 1966, 368 F.2d 962.

Judging the case from the viewpoint that most of the evidence which incriminated the accused was admitted and confirmed by him, some resort to emphatic and forceful expression by Government counsel was to be expected. Though the court declined to give the specific charge to the jury requested by appellant that it should acquit appellant if it found his religious claims to be honest and in good faith, it nevertheless permitted Dr. Leary to present his claims fully with reference to his religious and scientific beliefs and to support them with corroborating witnesses. The sincerity of the accused was undoubtedly at issue, and especially his credibility with reference to the possession of marihuana while the defendant was crossing the interna-

creed or color—makes no difference. The law applies equally to everyone, to all citizens. And that is one great thing about our country." (R. 545, 546.)

\* \* \* \* \*

"But after hearing this testimony for several days I don't think there can be any serious question about the fact that this business about psychedelics is not in the encyclopedias and it appears that there has nothing ever been written in print about it except things that he was connected with. This is a hoax and we respectfully submit that they tried to come down here and put off on a good jury of Laredo people a colossal hoax." (R. 551.)

\* \* \* \* \*

"To say that this was an unusual case would be a gross understatement, and to say that it's an important case would be a gross understatement, because, ladies and gentlemen, I have participated in what I feel is a considerable number of criminal cases and I cannot remember a case that I have felt more strongly about than I have this case, and I will tell you why:" (R. 578.)

\* \* \* \* \*

The only semblance of an objection made by defense counsel was that related to Government counsel's reference to defendant's alleged irresponsibility in raising his children. Government counsel stated:

"What kind of a man are you dealing with? What kind of a man do you have before you here today?

"You have a man that says, 'I believe in bringing up my children the old-fashioned way,' and the 'old-fashioned way' ladies and gentlemen, is to expose them to marihuana, expose them to these other drugs that he has no right to dispense. And that is what we have here.

"Is that irresponsibility?

"I can think of no—no other situation that it can be more irresponsible.

"Mr. Fitzgibbon: If your Honor please. I thought on the question of religion we weren't going to talk on it.

"The Court: Religion?

"Mr. Fitzgibbon: The right to bring up our children." (R. 581, 582.)

The matter was not further pursued by Mr. Fitzgibbon, defense counsel.

Government counsel also stated:

"But what does he do when he is finally exposed and they find out about it?

"He makes a joke about it. Now, I don't mean to shout, for shouting's sake, but I feel so strongly about this case and his acts that I can't help myself, and I hope that you will forgive me." (R. 585, 586.)

No error is seen in the reference in argument of Government counsel to the witness, Cutler, that "there is no reason to disbelieve this man—no motivation for him to falsify or no bad feelings toward Dr. Leary." We discuss the credibility of Cutler and the attempt to impeach him later in this opinion.

tional border at Laredo. We discern no personal hostility by the prosecution toward the defendant. Though Government counsel's summation of the case at times was strong, a fair reading of the entire argument, taken with the strong evidence of the defendant's guilt largely shown by his own admissions, does not convince us that there was plain error or abuse which affected defendant's substantial right to a fair trial or would justify reversal. Fed. R.Crim.P., Rule 52. That the defendant's teenage daughter was exposed to a home where the free use of marihuana by the family and inhabitants of the household (said to be for religious and scientific purposes) was regular, even routine—

but nevertheless in violation of the laws of the country—also permitted the prosecutor more leeway in final argument than might be expected under ordinary circumstances, and we are unable to say that zeal overcame fairness.[14]

 Defense counsel attempted to impeach a Government witness, Cutler, who testified on direct examination that he had attended a social gathering at Greenwich Village; that Dr. Leary had smoked marihuana at this party, which event occurred prior to the time which Dr. Leary admitted first using the drug. On cross-examination, counsel for the defense asked the witness, "How many

14. The following excerpt from the testimony while Dr. Leary was being interrogated by his counsel (Mr. Fitzgibbon) rather clearly indicates the common use of marihuana in the home and by the family of Dr. Leary:

"Q (By Mr. Fitzgibbon) Now, at home in Millbrook you stated that you used marihuana in the practice of your religion.
Do members of your family share this practice and belief with you?
"A You mean do they smoke marihuana?
"Q Yes.
"The Court: Is that what you are asking him?
"Mr. Fitzgibbon: No, sir. If your Honor please—strike that.
"Q (By Mr. Fitzgibbon) I just have one question about your family here.
Does marihuana play an integral part in your family life in the bringing up of your children—in the raising of your children?
Just answer that yes or no.
"A Well, the use of psychedelic drugs does.

* * * * *

"The Court: Well, I believe he may explain. He is apparently having some difficulty making a categorical answer.
"A (Continuing) You see, I can't explain why it's difficult for me to answer because—
"The Court: I think counsel is interested in the part marihuana plays in your family life.
Is that what you are asking him?
"Mr. Fitzgibbon: Yes, your Honor.
"The Court: You may tell us if you wish.
"Q (By Mr. Fitzgibbon) We have discussed the science, we have discussed

the religion and we have discussed the family.
Now, the family life—
"A Well, I would like to try to make—use two or three sentences to do this, because I am talking about a period of over six years in which the use of marihuana has been somewhat recent.
"Q Yes, sir.
"A Since 1960, since I started working through these experiences, most of the experiences that I was involved in were in my own home. The door of my home has never been locked and no room in my home has ever been locked. Hundreds and hundreds of psychedelic planned drug sessions have been run in my home. My children have always lived with me in my home. From the very beginning of this work I felt that this was a natural, personal, if you will, sacred experience that was not to be secret or behind doors. I couldn't bring—I had to have this—my children be open to this, to see what was going on. My children have walked in the room during perhaps hundreds of psychedelic drug sessions with religious leaders and with philosophers and so forth, in my home. When we were in Mexico on two occasions, we were doing research with primitive people. My children were with me. So that the use of psychedelic drugs is—and the discussion and the debates about how to use them—this is going on 24 hours a day in my home, so that the integral, central, almost exclusive part of our home life is centered on these spiritual and psychological activities.
"The Court: If I understand you, then, your children have observed and seen

times have you been picked up for smoking marihuana?" The question was an attempt to establish a criminal record of the witness and admittedly was asked to impeach his credibility.[15] The court properly sustained Government counsel's objection. Generally, only prior convictions of felonies or of misdemeanors involving moral turpitude are admissible in evidence for the purpose of impeachment of the credibility of a witness. Roberson v. United States, 5 Cir., 1957, 249 F.2d 737; Ramirez v. United States, 9 Cir., 1961, 294 F.2d 277; Homan v. United States, 8 Cir., 1960, 279 F.2d 767, cert. den. 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88 (1960); Beasley v. United States, 1954, 94 U.S.App.D.C. 406, 218 F.2d 366, cert. den. 349 U.S. 907, 75 S.Ct. 584, 99 L.Ed. 1243 (1955); United States v. Bell, 6 Cir., 1965, 351 F.2d 868. The trial court has wide discretion to limit cross-examination, Roberson v. United States, supra, and the exercise of such discretion should not be interfered with in the absence of a showing of prejudice to the defendant. Alderman v. United States, 5 Cir., 1929, 31 F.2d 499; Foster v. United States, 10 Cir., 1960, 282 F.2d 222. We ascribe no prejudice to the court's ruling. The jury was free to accept or reject the witness' testimony on this peripheral issue and was so instructed by the court. Cutler was not a major witness, though he was used by the prosecution on rebuttal to impeach Dr. Leary's testimony as to when he first began using marihuana. It is most unlikely that Cutler's statement had any substantial effect on the verdict in view of the defendant's own

what is going on but have not participated?

Is that a fair statement?

"The Witness: Yes, sir.

And I also wanted to make the point that marihuana was of a more recent addition and played a minor, but real part, in the last year.

"Q (By Mr. Fitzgibbon) You then think it's an important part of your role as a father to expose, I might say—use the term 'expose' your children to these scientific, psychedelic experiences?

"A Yes, sir.

"Q * * * And let them see how religion is carried on in their home?

"A Not just religion. It's a way of life. I am very old fashioned about bringing up children. I think that it's the home that determines the child, that the idea of sending your child out to some strangers to be educated—I believe the child should learn his father's trade, if possible or if he wants to, and that he should learn—both the religious and the philosophic and the way of life of his parents so that—

"Q Well, do you believe, then, that *every person should have a right to* raise their children as they believe?

"A I think that is one of the inalienable rights, not only of our Government but a God-given right to raise your children as best your conscience and your ignorance or wisdom has led you to believe.

"Q The way that you are raising your children at the present time, do you believe that you are raising them according to your beliefs, that you have a right to do so?

"A I do." (R. 305–309.)

15. The record reveals the cross-examination by Mr. Fitzgibbon for the defense of the witness, Cutler, on this issue as follows:

"And, of course, you were paid by the Government to come down here, were you not?

"A I wasn't paid by the Government to come down here. My expenses were paid, yes.

"Q Well, it's somewhat of an equivocation. Your expenses were paid to come down?

"A Yes. But I am receiving no salary or anything like that.

"Q You receive a certain amount of money per day, do you not?

"A Yes. I believe so.

"Q So you are being paid, then? Now, what—how many times have you been picked up for smoking marihuana?

"Mr. Susman: We object to that, your Honor.

"The Court: Are you undertaking to impeach the credibility of the witness? If you are, you may prove it by a prior conviction of felony.

"Mr. Fitzgibbon: Yes, your Honor.

"Q (By Mr. Fitzgibbon) Have you been convicted of a felony in this state or any other state?

"A No. I have not.

"Q You have not?

"Mr. Fitzgibbon: Pass the witness." (R. 461, 462.)

868

testimony that he frequently used marihuana, knowing it to be illegal, even if such use was purportedly for scientific or religious purposes.

■ Now, for the first time, on appeal, appellant states that Cutler was, at the time of trial when he testified, under indictment in the United States Court, Southern District of California, for smuggling marihuana into the United States from Mexico, and for bail jumping in connection with this charge; that this fact was known to the Government and not disclosed to Dr. Leary's counsel. The Government's answer is that Cutler had no prior convictions, had not been tried as yet on the California federal cases, and that if defense counsel had asked for this information it would have been given. We observe that the pending charges against Cutler are in no way connected with the present case, and that no attempt was made by counsel at the trial to go into any relationship between the witness and the prosecution which might have reflected on his credibility, except to show that the Government paid his expenses to come to Laredo to testify. There was obviously no suppression by the Government of Cutler's criminal record for there were no convictions against him when he testified, nor did the pending cases in California relate in any way to the present prosecution. The contention is without merit.

■ Appellant contends that the presumption under 21 U.S.C. § 176a, that marihuana is illegally imported and that a possessor has knowledge of illegal importation, is arbitrary and irrational in view of his contention that a high proportion of marihuana in the United States is domestically grown. To prove his point he has compiled certain statistics in published annual reports of the Bureau of Narcotics, 1957–1964, inclusive. This proof was not offered at the trial of the case and we assume we are asked to take judicial cognizance of information found in these public reports. By process of reasoning, appellant's counsel states that of all the marihuana in the United States well over 99 per cent has been domestically grown. Of course, the Bureau of Narcotics reports make no such statement and we are not impressed that it is correct. Obviously the information found in appellant's brief is incomplete for undoubtedly much marihuana from outside the United States does reach this country. Appellant does not purport to tell us what this amount is or to estimate it beyond his own rationalization of certain statistics he has assembled from published reports. No reference is made to seizures by state authorities nor is any provision suggested for the amount of marihuana which comes into the United States undetected. In other published reports which are equally available to the Court as are the Bureau of Narcotics annual reports relied on by appellant, United States Commissioner of Narcotics, Henry L. Giordano, testified before the House of Representatives Subcommittee of the Committee on Appropriations, on February 8, 1967, that "most of our marihuana comes from Mexico." [16] This official statement, which is in direct contradiction to the conclusions in exhibits prepared by appellant's counsel, shows rather well that appellant's information, submitted for the first time on brief, and

16. See Extracts from Treasury-Post Office Departments and Executive Office Appropriations for 1968, Hearings before a Subcommittee of the Committee on Appropriations, House of Representatives, 90th Cong., 1st Sess., p. 457, testimony of Mr. Giordano: "One of the problems, of course, is that most of our marihuana comes from Mexico. It is quite easy to smuggle it across the border and distribute it."
See also statement of Mr. Giordano, United States Commissioner of Narcotics at Hearings of the Special Senate Subcommittee on Narcotics of the Committee on the Judiciary, June 14, 1966, relative to the Narcotic Rehabilitation Act of 1966, in pertinent part as follows: "Large quantities of marihuana grown illicitly in Mexico are smuggled across the border into the United States. Although marihuana grown in the United States is occasionally found in the traffic, the Mexican variety, preferred by users, is most prevalent in the United States marihuana traffic."

not the subject of proof contradictorily at trial, is neither complete nor convincing.

In Caudillo v. United States, 9 Cir., 1958, 253 F.2d 513, the Ninth Circuit upheld the constitutionality of the presumption in 21 U.S.C. § 176a, that marihuana is illegally imported and the possessor has knowledge of importation.[17] The court noted the necessity under the requirements of Tot v. United States, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), of rational connection between the facts proved and the ultimate fact presumed, and said:

> "Though there might be differences of opinion, it can reasonably be argued that the facts of marihuana importation are so well-known, particularly to marihuana users, that there is a 'rational connection between the fact proved and the ultimate fact presumed.'"

The Ninth Circuit in *Caudillo* also pointed out, "The statutory language in question has long existed in the narcotic laws" and was upheld by the Supreme Court in Yee Hem v. United States, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904 (1925), in reference to opium. The court said that as to marihuana, "If experience is the test of the validity of an inference, then the legislatively created inference in this case is well supported." 253 F.2d at 517.

██ We believe, as was expressed so well in United States v. Gainey, 380 U.S. 63, 67, 85 S.Ct. 754, 757, 13 L.Ed.2d 658 (1965):

> "The process of making the determination of rationality is, by its nature, highly empirical, and in matters not within specialized judicial competence or completely commonplace, significant weight should be accorded the capacity

of Congress to amass the stuff of actual experience and cull conclusions from it."

That being true, and with the benefit of the legislative history to which we have already referred, it is clear that the experience of Congress shows that it is gravely concerned with the smuggling, transportation, concealment and possession of imported marihuana. When Congress passed the Marihuana Tax Act of 1937 from which are derived certain provisions of the United States Code involved here, i. e., 26 U.S.C. §§ 4741, 4742, and 4744, extensive Congressional hearings preceded the passage of the Act. They are referred to in appellant's brief as Hearings before the Committee on Ways and Means, 75th Cong., 1st Sess., H.R. 6385 (1937). The report of the proceedings shows unmistakably that Congress intended "to discourage the current and widespread undesirable use of marihuana," and that the development of a scheme of taxation would "render virtually impossible the acquisition of marihuana by persons who would put it to illicit uses." Witnesses referred to the "injurious effect it has upon the public health and morals of this country," especially for younger people who are attracted to it. The then Commissioner of Narcotics, Mr. Anslinger, said, "This drug is entirely the monster Hyde, the harmful effect of which cannot be measured." He pointed out that all of the states had passed laws against marihuana. Numerous expert witnesses referred to the dangerous nature of the drug, its effect on those who use it, to criminal episodes of terrible character which accompanied its use. The evidence was voluminous and convincing that marihuana is a serious evil to society. Thus did Congress wisely and prudently enact this law and clearly meet the "compelling state interest" test imposed in

---

17. See also Borne v. United States, 5 Cir., 1964, 332 F.2d 565; Claypole v. United States, 9 Cir., 1960, 280 F.2d 768; Brown, The Constitutionality of Statutory Criminal Presumptions, Modern Practice Commentator, Vol. V, No. 1, p. 92, May 1967. Cf. Maltos-Roque v. United States, 5 Cir., 1967, 381 F.2d 130.

Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).[18]

■ Appellant contends that 26 U.S. C. § 4741(a), which imposes a tax on all transfers of marihuana, and 26 U.S.C. § 4742, which requires that such transfers be accompanied by written order forms issued by the Secretary of the Treasury, are unconstitutional in that they violate the Fifth Amendment privilege against compulsory self-incrimination. He argues, therefore, that his conviction under Count 3, which charged that defendant transported and concealed marihuana, being a transferee required to pay a transfer tax, in violation of 26 U.S.C. § 4744 (a), is invalid. This Circuit has had occasion to rule on this precise point in Haynes v. United States, 5 Cir., 1964, 339 F.2d 30, cert. den. 380 U.S. 924, 85 S.Ct. 926, 13 L.Ed.2d 809 (1965), in which the court found no merit to the contention "that the appellant was required to incriminate himself by registration and payment of taxes and, hence, that the statutes under which he was convicted are unconstitutional * * *." [19]

We find, without merit, appellant's final point of error that the District Court erred in refusing to instruct the jury that they could consider as a defense to Count 2 defendant's honest and sincere belief that he had a right to possess marihuana in violation of the law because of his religious and scientific beliefs. Appellant argues that the jury could have found, if so instructed by the court, that this belief negated the specific intent necessary under 21 U.S.C. § 176a. This point is in effect substantially similar to those contentions of appellant which we have already considered and rejected relating to the defense of religious claims that appellant was honest and in good faith in his use of marihuana, and to the contention that the presumption in Section 176a that possession of marihuana is sufficient evidence to authorize conviction unless explained by the defendant to the satisfaction of the jury is unconstitutional.

Affirmed.

18. See also additional legislative history supporting the propriety of anti-marihuana enactments by Congress: 1956 U.S.Code, Cong. & Adm.News, p. 3274, relative to the Narcotic Control Act of 1956 (when the legislative presumption was included which made the unexplained possession of marihuana by the defendant sufficient evidence for conviction); 1951 U.S.Code, Cong. & Adm.News, p. 2602, in which the Narcotic Drugs Import & Export Act and the Internal Revenue laws relative to narcotics was amended in order to provide greater uniformity of penalties for violations of those laws.

19. See also Rule v. United States, 5 Cir., 1966, 362 F.2d 215, which upheld the constitutionality of 21 U.S.C. § 176a against an attack that the statute violated the Fifth Amendment privilege against self-incrimination; Manning v. United States, 5 Cir., 1960, 274 F.2d 926, which upheld the constitutionality of the presumption in 26 U.S.C. § 4744(a) of guilt in failing to pay the transfer tax on marihuana (which presumption arises from failure to produce the required order forms) against an attack that due process had been violated; Palma v. United States, 5 Cir., 1958, 261 F.2d 93, which upheld the constitutionality of 18 U.S.C. § 1407—which statute requires that a United States citizen, who has been convicted of violating a narcotics law under certain circumstances, register prior to departure from or entry into the United States—against attacks of unreasonable search and seizure under the Fourth Amendment, self-incrimination, lack of due process, vague and indefinite standards and restraint of civil liberty, under the Fifth Amendment, and cruel and unusual punishment under the Eighth Amendment; and Reyes v. United States, 9 Cir., 1958, 258 F.2d 774, which upheld the constitutionality of the same statute, 18 U.S.C. § 1407.