Mortimer H. W. COX, Administrator of the Estate of Leona A. Jackson, Deceased

v.

Arthur O. HECKER.

Mortimer H. W. COX, Administrator of the Estate of Leona A. Jackson, Deceased

v.

Eleanore R. HECKER, also known as Eleanore R. Wright.

Civ. A. Nos. 26209, 26210.

United States District Court
E. D. Pennsylvania.
July 9, 1963.

---

**750**

William H. Turner, Media. Pa., for plaintiff.

James E. Beasley, Beasley & Ornsteen, Philadelphia, Pa., for defendant Arthur O. Hecker.

Francis E. Shields, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant Eleanore R. Hecker, a/k/a Eleanore R. Wright.

LUONGO, District Judge.

Plaintiff was unsuccessful in his effort to recover against the defendants in these two suits. He now seeks a new trial. The cases were tried together and they will be referred to at some points in this opinion as if they were one.

In this suit, the administrator of the estate of a decedent (Leona Jackson) sought to recover damages from Drs. Arthur O. Hecker and Eleanore Wright, Superintendent and Medical Director, respectively, of the Embreeville State Mental Institution, for alleged harm caused to decedent by the administration of a tranquilizing drug, chlorpromazine (hereinafter referred to by its trade name Thorazine). Both defendants held administrative positions at Embreeville. As Superintendent, Dr. Hecker was the chief administrative officer and, as Medical Director, Dr. Wright had administrative charge of the various chiefs of service. Dr. Harris, a duly licensed physician and psychiatrist, was head of the female division. Under his supervision decedent was treated by Drs. Mainero and deSchut, foreign nationals who were taking residency training at Embreeville. The residency training of the latter was pursuant to a program of the United States State Department under which a number of foreign doctors were admitted for residency training in the United States provided they were accepted by institutions approved for such training. Embreeville was such an institution and Mainero and deSchut were accepted for training there. As a prerequisite to their acceptance, they obtained training certificates issued by the Pennsylvania Board of Medical Licenses after application to and interview by that body.

Prior to the treatment complained of, decedent had a history of mental and physical ills. She was a diabetic and suffered from a generalized arteriosclerotic disease. She had been hospitalized

for mental disorders for a period of five months in 1953 at Embreeville and for a period of five weeks in 1956 at Philadelphia Psychiatric Hospital.

Decedent's husband caused her to be admitted to Embreeville on April 27, 1957. During her stay there one of her problems was her inability to adhere to the diet required by her diabetic condition. The tranquilizing drug, Thorazine, was prescribed and administered in an effort to enable her to adhere to the diet. Commencing on May 14, 1957, decedent's husband noticed changes in her physical condition as well as a worsening state of mental confusion.

On August 7, 1957, decedent was removed from Embreeville and two days later was admitted to Philadelphia Psychiatric Hospital where she remained until October 18, 1957. From that date on, she was in and out of mental institutions until, on December 28, 1961, she died from causes wholly unrelated to the subject matter of this suit.

It was plaintiff's contention that Thorazine caused brain damage to decedent resulting in a state of confusion persisting and becoming progressively worse until her death. The medical evidence in support of plaintiff's claim consisted of the testimony of Dr. Stahlnecker, an internist, and Dr. Staples, a psychiatrist.

Dr. Stahlnecker had treated decedent for her diabetic condition from 1954 until her death. From his testimony it appeared that there were numerous complaints of delusions and hallucinations commencing at least as early as 1955. Dr. Stahlnecker testified that he examined decedent at the Media Clinic on July 26, 1957, at which time he was of the opinion that she was suffering side effects from the use of Thorazine. He saw her again on August 30, 1957, by which time that condition had improved and had largely disappeared. He saw her on a number of occasions after August 1957. During 1958 and 1959 her condition fluctuated. He did not see her again until 1961 when her condition became steadily worse.

Dr. Stahlnecker stated as his opinion that the side effects from the use of Thorazine which he noted on July 26, 1957, were temporary in nature, causing no permanent injury to decedent's brain. He testified further that neurological damage could be caused by arteriosclerosis, particularly when that condition is combined with diabetes as it was in decedent's case. He ruled out brain damage from Thorazine on the ground that there was no progressive decline in her condition from the time Thorazine was administered. Had the brain cells been damaged, the condition would not have improved, it could only get worse.

Dr. Staples, the psychiatrist, treated decedent from time to time beginning February 1953. He declined to express an opinion as to whether Thorazine damaged decedent's brain cells. He testified that when he saw decedent in July, 1957, he believed she was in a toxic state caused by the use of Thorazine but he could not and would not say that decedent suffered any permanent brain damage from it. His diagnosis in 1957, as recorded in the records of the Philadelphia Psychiatric Hospital, was that decedent was suffering from chronic brain syndrome of unknown cause and at the trial his opinion remained unchanged.

The Court submitted the question of negligence of the defendants to the jury; whether, under all the circumstances, Dr. Hecker had acted reasonably and prudently in approving the applications for residency training and in engaging the services of Drs. Mainero and deSchut; and whether Dr. Wright had acted reasonably and prudently in making use of their services under the circumstances under which they were used. The jury responded with verdicts in favor of both defendants.

The grounds advanced by plaintiff for new trial are numerous and the brief in support thereof is voluminous. I have considered carefully each of the points advanced by plaintiff and, finding them without merit, I deny the motion for new trial. Only two of the grounds asserted, (a) insufficient time for counsel to pre-

pare for trial, and (b) refusal of the Court to charge on negligence as a matter of law, require comment.

(a) Inadequacy of time to prepare for trial:

The complaints in both actions were filed on April 10, 1959. The cases first came on for trial before me on December 3, 1962. After two days of trial *decedent's husband* moved for the withdrawal of a juror. Decedent's husband is a member of the bar of this Court and throughout the two days of that trial appeared to be in constant conflict with then trial counsel (a most capable and experienced one) over the manner in which the case was being tried. The request for the withdrawal of a juror was to enable decedent's husband to retain other counsel. Because of the apparent strain of the situation upon trial counsel, and because of his joinder in the motion for withdrawal of a juror, the request was granted, but only upon the condition and with the express understanding that the case be set down for trial for the next trial session commencing early in January 1963. At the beginning of that trial session application for a further postponement was made to and was denied by the Calendar Judge, nevertheless, because of the state of the trial list, the case did not come on for trial until February 4, 1963, two months after the aborted first trial.

It is obvious that the real party in interest and the moving force in this lawsuit is decedent's husband. He suffered a severe blow from his wife's tragic condition. Because of bitterness engendered by that loss he obviously has worked long and hard in preparing this case. He testified that as early as July 19, 1957, he had decided to institute suit. In that same month he had his wife examined by Drs. Stahlnecker and Staples and he had an attorney friend accompany him to an interview with Dr. Wright;

on August 2, 1957, he took his wife out of Embreeville to be photographed, all in preparation for the contemplated suit.

■ Decedent's husband apparently did all of the trial preparation. He had every fact, every record, every detail at his finger tips. Having prepared the case so thoroughly, he was in a position to brief new trial counsel quickly and thoroughly. Under such circumstances, a period of two months was ample time for counsel to prepare for trial. The excellent manner in which the case was tried belies the charge that plaintiff's case was prejudiced in any way by insufficient time for counsel to prepare for trial.

(b) Instructions on negligence:

■ At the outset it would be well to set forth what this suit did *not* involve. It was *not* an action charging defendants with malpractice. Defendants were administrators and did not treat decedent. It was *not* a suit against defendants based on respondeat superior. Under Pennsylvania law, a state official is not liable for the negligence of subordinates of suitable skill and ability unless he commanded the negligent act to be done. Commonwealth to Use of Orris v. Roberts, 392 Pa. 572, 141 A.2d 393, 71 A.L.R.2d 1124 (1958).

What this case did involve was a charge of negligence against the defendants for their own alleged acts and omissions in the performance of their duties. Plaintiff's theory of the case, as it finally evolved, was: Mainero and deSchut, who treated decedent and who prescribed Thorazine for her, were not licensed to practice medicine in Pennsylvania; under Federal[1] and State[2] law only licensed physicians may prescribe Thorazine; defendants knew that Mainero and deSchut were not licensed and were, therefore, incompetent to practice medicine and to prescribe Thorazine in Penn-

1. Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq.

2. Pennsylvania Dangerous Drug Act of 1955, 35 P.S. § 935.1, now superseded by Drug, Device and Cosmetic Act, 35 P.S. § 780-1 et seq.

sylvania; defendants were, thus, negligent as a matter of law in permitting incompetent subordinates to prescribe and administer Thorazine to decedent.

Plaintiff seems to rest his theory of liability on section 286 of the Restatement of Torts.[3] In doing so he has misconceived the purpose of the statutes on which he relies. From a reading of those statutes and of the cases decided thereunder, it is evident that their aim is the protection of the public from abuses in the sale and dispensing of drugs, and the protection of the unwary and uninformed from the hazards of mislabeling, misbranding, and adulteration. Nothing in the Federal or the State statutes in question indicates an intention on the part of either legislative body to set up standards governing a doctor's treatment of his patient. The statutes relied upon by plaintiff are, therefore, not applicable for the purpose for which he seeks to use them. It would have been error to have instructed the jury in terms of negligence as a matter of law for violation of those statutes.

The issue then was whether or not defendant Hecker was negligent in making recommendations for the hiring of Mainero and deSchut and whether or not defendant Wright was negligent in permitting them to treat decedent under the conditions which existed at Embreeville. These were factual determinations for the jury. Mainero and deSchut were not notoriously incompetent. See Restatement of Torts § 308, especially comment b. They were not barred from obtaining a license as a child is barred from obtaining a driver's license. Chamberlain v. Riddle, 155 Pa.Super. 507, 38 A.2d 521 (1944). There was considerable evidence of their competence to treat. decedent, e. g. they were graduates from medical schools in their own countries; the United States State Department had taken certain precautions in accepting foreign doctors for residency training; they worked under the supervision of a. licensed practitioner; progress and treatment of patients were regularly discussed at staff meetings. The jury resolved those issues in favor of the defendants.

Even had plaintiff been able to establish that either or both of the defendants were guilty of negligence, plaintiff's case would still have been deficient. It was incumbent on plaintiff to establish, by expert medical testimony, that decedent sustained harm from improper administration of the drug. Grantham v. Goetz, 401 Pa. 349, 164 A.2d 225, (1960); Donaldson v. Maffucci, 397 Pa. 548, 156 A.2d 835 (1959); Robinson v. Wirts, 387 Pa. 291, 127 A.2d 706 (1956); Powell v. Risser, 375 Pa. 60, 99 A.2d 454 (1953). There was no expert testimony to establish that administration of Thorazine was improper under the circumstances, nor was there any expert medical testimony to establish, by the standards. required under Pennsylvania law, that. Thorazine caused permanent damage to decedent. In tacit recognition of that fatal deficiency in his case, plaintiff now asks this Court to disregard that requirement of Pennsylvania law. Of course I may not. This is a diversity case and Pennsylvania law is binding upon me. On the state of this record. there is no proof of harm to decedent from improper administration of the drug Thorazine.

Plaintiff's motion for new trial is denied.

---

3. "§ 286. Violations Creating Civil Liability.

"The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if:

"(a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and

"(b) the interest invaded is one which the enactment is intended to protect; and,

"(c) where the enactment is intended to protect an interest from a particular hazard, the invasion of the interests results from that hazard; and,

"(d) the violation is a legal cause of the invasion, and the other has not so conducted himself as to disable himself from maintaining an action."