**UNITED STATES of America**
**v.**
**Judith H. KUCH.**
**Crim. No. 1473–67.**

United States District Court
District of Columbia.
July 1, 1968.

Albert J. Ahern, Jr., Washington, D. C., for defendant.

Geoffrey M. Alprin, Asst. U. S. Atty., Washington, D. C., for the United States.

## OPINION

GESELL, District Judge.

Judith H. Kuch, who avers she is an "ordained minister of the Neo-American Church", stands indicted in a seven-count indictment for unlawfully obtaining and transferring marihuana and for the unlawful sale, delivery and possession of LSD. She moves to dismiss on several grounds.

Counts 1, 2 and 7 of the indictment are brought under sections of the Marihuana Tax Act of 1937, 50 Stat. 551, as amended, Int.Rev.Code of 1954, 26 U.S.C. §§ 4741–4776. The Act provides for a licensing system, occupational and transfer taxes, and receipting requirements for transfers, and is modeled largely on the Harrison Narcotic Drug Act, Ch. 1, 38 Stat. 785 (1914), 26 U.S.C. §§ 4701–4736, which began the federal regulation of narcotics.

In United States v. Sanchez, 340 U.S. 42, 71 S.Ct. 108, 95 L.Ed. 47 (1950), the Supreme Court held that the Marihuana Tax Act was a constitutional exercise of the taxing power. The Court noted that a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed. This principle applies, the Court said, even though the revenue purpose of the tax may be secondary. The Court concluded in Sanchez that:

"The tax in question is a legitimate exercise of the taxing power despite its collateral regulatory purpose and effect." 340 U.S. at 45, 71 S.Ct. at 110.

Counts 3 through 6, the remaining counts of the indictment, are brought under the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040 et seq., as amended, 21 U.S.C. §§ 301–392. This Act, an appropriate exercise of the commerce power, was intended to protect consumers from misleading claims made in connection with the sale of certain products and from the hazards of adulteration, mislabeling, and misbranding.[1] It was amended by the Drug Abuse Control Amendments of 1965. In these amendments Congress declared that it had found:

"that there is a widespread illicit traffic in depressant and stimulant drugs moving in or otherwise affecting interstate commerce; that the use of such drugs, when not under the supervision of a licensed practitioner, often endangers safety on the highways * * * and otherwise has become a threat to the public health and safety * * *." Pub.L. No. 89–74, § 2, 79 Stat. 226; 1965 U.S.Code Cong. and Adm. News, p. 241.

Marihuana is specifically exempted from regulation contemplated under the amendments for other depressant or stimulant drugs[2], but LSD, on the other hand, is specifically listed as a depressant or stimulant drug[3] and by virtue of such listing, LSD is subject to the Act, notably, 21 U.S.C. §§ 360(a), 360a(c), 331(q) (2), (3) and 333.

Defendant by her motions to dismiss contends that the criminal penalties provided for violation of these Acts may not be applied as to her for several reasons relating in various ways to her basic contention that the laws impinge on her constitutional right in the free exercise of her alleged religion. A hearing was held and testimony and exhibits received in support of Kuch's religious claims. She presented no subjective evidence as to her individual beliefs but chose to rely on her office in the Church and proof

---

1. United States v. Ellis Research Laboratories, Inc., 300 F.2d 550 (7th Cir. 1962), cert. denied, 370 U.S. 918, 82 S.Ct. 1558, 8 L.Ed.2d 499 (1962); Cox v. Hecker, 218 F.Supp. 749 (E.D.Pa.1963), aff'd, 330 F.2d 958 (3rd Cir. 1964), cert. denied, 379 U.S. 823, 85 S.Ct. 46, 13 L.Ed. 2d 33 (1964), rehearing denied, 379 U.S. 917, 85 S.Ct. 258, 13 L.Ed.2d 188 (1964).

2. Marihuana is specifically exempted by 21 U.S.C. § 321(v) (3).

3. LSD is listed in 21 CFR § 166.3(c) (3) which defines the term "depressant or stimulant drug" as used in 21 U.S.C. § 321(v) (3).

as to the requirements and attitudes of the Church as constituted. The Court has concluded that the facts and authorities discussed below do not support her contentions for several separate and independent reasons.

The Neo-American Church was incorporated in California in 1965 as a non-profit corporation. It claims a nation-wide membership of about 20,000. At its head is a Chief Boo Hoo. Defendant Kuch is the primate of the Potomac, a position analogized to bishop. She supervises the Boo Hoos in her area. There are some 300 Boo Hoos throughout the country. In order to join the church a member must subscribe to the following principles:

"(1) Everyone has the right to expand his consciousness and stimulate visionary experience by whatever means he considers desirable and proper without interference from anyone;

"(2) The psychedelic substances, such as LSD, are the true Host of the Church, not drugs. They are sacramental foods, manifestations of the Grace of God, of the infinite imagination of the Self, and therefore belong to everyone;

"(3) We do not encourage the ingestion of psychedelics by those who are unprepared."

Building on the central thesis of the group that psychedelic substances, particularly marihuana and LSD, are the true Host, the Church specifies that "it is the Religious *duty* of all members to partake of the sacraments on regular occasions."

A Boo Hoo is "ordained" without any formal training. He guides members on psychedelic trips, acts as a counselor for individuals having a "spiritual crisis," administers drugs and interprets the Church to those interested. The Boo Hoo

of the Georgetown area of Washington, D. C., testified that the Church was pantheistic and lacked a formal theology. Indeed, the church officially states in its so-called "Catechism and Handbook" that "it has never been our objective to add one more institutional substitute for individual virtue to the already crowded lists." In the same vein, this literature asserts "we have the *right* to practice our religion, even if we are a bunch of filthy, drunken bums." The members are instructed that anyone should be taken as a member "no matter what you suspect his motives to be."

■ The dividing line between what is, and what is not, a religion is difficult to draw. The Supreme Court has given little guidance. Indeed, the Court appears to have avoided the problem with studied frequency in recent years.[4] Obviously this question is a matter of delicacy and courts must be ever careful not to permit their own moral and ethical standards to determine the religious implications of beliefs and practices of others. Religions now accepted were persecuted, unpopular and condemned at their inception.

■■ Subtle and difficult though the inquiry may be, it should not be avoided for reasons of convenience. There is need to develop a sharper line of demarkation between religious activities and personal codes of conduct that lack spiritual import. Those who seek the constitutional protections for their participation in an establishment of religion and freedom to practice its beliefs must not be permitted the special freedoms this sanctuary may provide merely by adopting religious nomenclature and cynically using it as a shield to protect them when participating in antisocial conduct that otherwise stands condemned. In a complex society where the requirements of public safety, health and order must be recognized, those who seek immunity

4. United States v. Ballard, 322 U.S. 78, 86, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); Davis v. Beason, 133 U.S. 333, 342, 10 S.Ct. 299, 33 L.Ed. 637 (1890); Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940); Fowler v. State of Rhode Island, 345 U.S. 67, 69, 73 S.Ct. 526, 97 L.Ed. 828 (1953).

from these requirements on religious grounds must at the very least demonstrate adherence to ethical standards and a spiritual discipline.

■ The defendant has sought to have the Church designated a religion primarily by emphasizing that ingestion of psychedelic drugs brings about a religious awareness and sharpens religious instincts. There was proof offered that the use of psychedelic drugs may, among other things, have religious implications. Various writings on the subject were received in evidence and testimony was taken from two professors, not members of the Church but having theological interest in the subject, who had themselves taken drugs experimentally and had studied religious manifestations of psychedelic drug ingestion.

Just as sacred mushrooms have for 2,000 years or more triggered religious experiences among members of Mexican faiths that use this vegetable, so there is reliable evidence that some but not all persons using LSD or marihuana under controlled conditions may have what some users report to be religious or mystical experiences. Experiments at Harvard and at a mental institution appear to support this view and there are specific case histories available, including the accounts of the professors who testified as to their personal experience under the influence of psychedelic drugs. Researchers have found that religious reactions are present in varying degrees in the case of from 25 percent to 90 percent of those partaking. A religious reaction appears most frequently among users already religiously oriented by training and faith. While experiences under the influence have no single pattern, a religious reaction includes the following effects. Sometimes senses are sharpened and apparently a mixed feeling of awe and fear results. There may be mystery, peace, and a sharpening of impressions as to all natural objects, perhaps even something akin to the vision Moses had of a burning bush as described in Exodus. That there may be wholly different effects upon given individuals is equally clear. Psychotic episodes may be initiated, leading to panic, delusions, hospitalization, self-destruction and various forms of antisocial and criminal behavior, as will be later indicated in more detail.

While there may well be and probably are some members of the Neo-American Church who have had mystical and even religious experiences from the use of psychedelic drugs, there is little evidence in this record to support the view that the Church and its members as a body are motivated by or associated because of any common religious concern. The fact that the use of drugs is found in some ancient and some modern recognized religions is an obvious point that misses the mark. What is lacking in the proofs received as to the Neo-American Church is any solid evidence of a belief in a supreme being, a religious discipline, a ritual, or tenets to guide one's daily existence.[5] It is clear that the desire to use drugs and to enjoy drugs for their own sake, regardless of religious experience, is the coagulant of this organization and the reason for its existence.

Reading the so-called "Catechism and Handbook" of the Church containing the pronouncements of the Chief Boo Hoo, one gains the inescapable impression that the membership is mocking established institutions, playing with words and totally irreverent in any sense of the term. Each member carries a "martyrdom record" to reflect his arrests. The Church symbol is a three-eyed toad. Its bulletin is the "Divine Toad Sweat." The Church key is, of course, the bottle opener. The official songs are "Puff, the Magic Dragon" and "Row, Row, Row Your Boat." In short, the "Catechism and Handbook" is full of goofy nonsense, contradictions, and irreverent expres-

5. Fellowship of Humanity v. County of Alameda, 153 Cal.App. 673, 315 P.2d 394 (1957); Washington Ethical Society v. District of Columbia, 101 U.S.App.D.C. 371, 249 F.2d 127 (1957).

sions. There is a conscious effort to assert in passing the attributes of religion but obviously only for tactical purposes. Constitutional principles are embraced wherever helpful to the cause but the effect of the "Catechism and Handbook" and other evidence as a whole is agnostic, showing no regard for a supreme being, law or civic responsibility.

The official seal of the Church is available on flags, pillow cases, shoulder patches, pill boxes, sweat shirts, rings, portable "communion sets" with chalice and cup, pipes for "sacramental use," and the like. The seal has the three-eyed toad in the center. The name of the Church is at the top of the seal and across the bottom is the Church motto: "Victory over Horseshit!". The Court finds this helpful in declining to rule that the Church is a religion within the meaning of the First Amendment. Obviously the structure of this so-called Church is such that mere membership in it or participation in its affairs does not constitute proof of the beliefs of any member, including Kuch. In short, she has totally failed in her burden to establish her alleged religious beliefs, an essential premise to any serious consideration of her motions to dismiss.

■ Assuming, however, that the Neo-American Church is a genuine religion and that Kuch subscribes fully to its doctrines and thus may invoke the full constitutional guarantees for free religious expression, her contentions are still without merit. The Constitution protects the right to have and to express beliefs. It does not blindly afford the same absolute protection to acts done in the name of or under the impetus of religion. Leary v. United States, 383 F.2d 851, 859 (5th Cir. 1967), rehearing denied, 392 F.2d 220 (1968), cert. granted, 392 U.S. 903, 88 S.Ct. 2058, 20 L.Ed.2d 1362 (June 10, 1968).

■ The practices of the Neo-American Church involving the use, possession, transfer and sale of marihuana and LSD are contrary to the criminal law. Starting with an acceptance of Kuch's religious claim, it is necessary to determine whether the legislation under which defendant stands indicted unduly infringes her freedom to practice what she asserts are religious beliefs. Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). As the Court has instructed in the flag salute cases, freedom of worship is "susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943). This is not a precise test and only recently has the Court sought to put flesh on the bones of this doctrine. It now appears from a reading of such cases as Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); and United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), that claims such as claims of religious exemption will be honored unless a substantial state interest will be frustrated in a significant way.

■ Defendant misconceives the Constitution and the decisions when she claims in effect an unbridled right to practice her beliefs. The public interest is paramount and if properly determined the Congress may inhibit or prevent acts as opposed to beliefs even where those acts are in accord with religious convictions or beliefs. If individual religious conviction permits one to act contrary to civic duty, public health and the criminal laws of the land, then the right to be let alone in one's belief with all the spiritual peace it guarantees would be destroyed in the resulting breakdown of society. There is abroad among some in the land today a view that the individual is free to do anything he wishes. A nihilistic, agnostic and anti-establishment attitude exists. These beliefs may be held. They may be expressed but where they are antithetical to the interests of others who are not of the same persuasion and contravene

criminal statutes legitimately designed to protect society as a whole, such conduct should not find any constitutional sanctuary in the name of religion or otherwise.

Mormons were not permitted to practice polygamy.[6] Nor would the Constitution protect the practice of religions requiring infanticide, the killing of widows, or temple prostitution, as some religions have done in the past. The vital significance of the constitutional protection of religion will be diluted by a degree of tolerance that accepts the practice of acts which leave society helpless to protect itself.

Unfortunately we have been gradually drifting away from this pristine view taken by our founding fathers that religious beliefs were to be upheld at all cost but that acts induced by religious beliefs could be prohibited where Congress spoke in the interests of society as a whole. Recent decisions of the Supreme Court suggest that there must be a balancing of the legislative end to be achieved against the effect of the legislation on practices and hence the acts of the members of a particular religion.[7] This is but a way of saying that each case will depend on its own facts and a balancing of factors as the members of the court may see them at any given point in time. No United States District Judge who must act within the confines of a record and available judicial time has the wisdom or means of doing adequately what the cases appears to require. It is to be hoped that there will develop a constitutional doctrine in this field that more closely approximates that contemplated by the framers of the Constitution and that leaves the balancing function in all but obvious cases of clear abuse in the hands of the Congress, where it belongs. Be that as it may, the Court has carefully sought to apply prevailing doctrine in this field. The Court concludes that under any common sense view of undisputed facts the full enforcement of the statute here involved is necessary in the public interest and the unintended but obvious restrictions on the practices of defendant's church are wholly permissible.

There is substantial evidence that the use of marihuana creates a health hazard, is often the first step toward serious drug addiction in the progression to heroin, and is frequently associated with the commission of non-drug crimes, often crimes of violence. While all its effects are still unknown and the reactions of users differ, depending on emotional, psychological and frequency-of-use factors, the drug marihuana may often predispose to antisocial behavior and precipitate psychotic episodes. Among other reactions, hallucinations and delusions, impairment of judgment and memory, and confusion and delirium are common. Among chronic users, extremely violent aggressive conduct is manifested. Medical experts, narcotic experts, law enforcement officials, psychologists and proponents of freer marihuana use are not in accord but there is a very substantial body of opinion among individuals in each of these categories which supports the implications of marihuana use summarized above.[8]

As recently as May 17, 1968, the United Nations Economic and Social Council in a report of the Social Committee on Narcotic Drugs called attention to the 1961 Single Convention on Narcotic Drugs which placed marihuana in a special category with heroin as liable to abuse and to produce ill effects. It called on all countries to increase their efforts to eradicate the abuse and illegal

6. Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878).

7. Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

8. The Court takes judicial notice, under the ruling in Flippin v. United States, 121 F.2d 742 (8th Cir.), cert. denied, 314 U.S. 677, 62 S.Ct. 184, 86 L.Ed. 542 (1941), of the expert scientific opinion listed in Appendix A to this Opinion.

traffic in the drug. It emphasized the need for strict control, noting that marihuana is known to distort perception of time and space, modify mood and impair judgment, which may result in unpredictable behavior, violence and adverse effects on health, and that it may be associated with the abuse of other drugs such as LSD, stimulants and heroin. To except the members of the Neo-American Church from the regulation of this drug, as Kuch requests, would not amount to some slight exception that would in no way interfere with the purposes of the Marihuana Tax Act. On the contrary, it would permit anyone to violate the law by paying the Church membership fee. The number of marihuana cases in this Court suggests that there are many who would quickly take out membership and the Act would soon be a nullity.

Defendant Kuch advances two specific claims in support of her general thesis. These relate primarily to counts 1, 2 and 7, which involve marihuana. First, relying on such cases as United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed.1234 (1938), she asks that the Marihuana Tax Act enacted in 1937 be declared null and void as to her religious practices because it no longer has any rational basis and is not supported by a present necessary state interest given present knowledge and information as to this drug and its effects. Second, she invokes the equal protection clause of the Constitution and demands that the statute not be enforced as to her religious use and transfer of marihuana because the Food and Drug Administration and the California State Supreme Court have authorized the Native American Church to use a wholly comparable if not more powerful drug, peyote, in the long-established ritual of that church, most of whose members are American Indians.

The Court was asked to take testimony on these issues but after careful consideration has determined that hearings would serve no useful purpose. Preliminary to any hearing the Court requested the parties to furnish materials bearing on the issues which could be judicially noticed. Voluminous writings were so furnished.[9] For reasons hereafter set forth they suffice for purposes of the motion and will be judicially noticed to the extent indicated in the text.

United States v. Carolene Products Co., 304 U.S. 144, 153, 58 S.Ct. 778, 784 (1938) states that "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." If such facts are beyond the sphere of judicial notice they may be made the subject of judicial inquiry. Apparently this decision permits a re-examination in the face of the presumption favoring constitutionality and the regularity of the legislative process—at least where economic legislation is concerned. Here we are concerned with a criminal statute carrying heavy felony penalties. Whether the rule of *Carolene Products* applies in non-economic matters has apparently not been determined by the United States Supreme Court. There would, however, appear to be no reason for making any distinction one way or the other. Accordingly, the Court has tested the premises underlying congressional action as to marihuana.

The Marihuana Tax Act was not conceived or enacted in any atmosphere of religious prejudice. Indeed, the Neo-American Church was not then even in existence. The statutes developed out of congressional concern with drug problems and supporting testimony from responsible individuals was given at the congressional hearings.[10] The problem

9. See n. 8, supra.

10. Hearings before the Committee on Ways and Means, House of Rep., 75th Cong., 1st Sess., H.R. 6385, pp. 19, 21–23, 30–36, 39, 48–50, 54, 57, 58, 88–90, 100, 112, 117, 123–124; H.R.Rep. No. 792, 75th Cong., 1st Sess. 2; Hearings before Subcommittee of the Committee on Finance, U.S. Senate, H R. 6906, 75th Cong., 1st Sess., S.Rep. No. 900, 75th Cong., 1st Sess. 3.

before the Court at this stage is not to substitute its judgment for that of Congress or to inquire into the bona fides of the congressional witnesses. Unless there has been a dramatic and fundamental change in scientific knowledge and law enforcement attitudes concerning the uses and effects of marihuana the legislation will not be questioned.

The Court is not required nor would it be proper to substitute its judgment for that of the Congress. It is only necessary to examine the facts to determine whether in view of the restriction which the Marihuana Tax Act places on the acts of members of the Neo-American Church, Congress had a rational basis for the enactment and whether there continues to be a substantial basis for its continued enforcement. This is something quite different from what Kuch seeks for she would have the Court determine that those who feel marihuana is practically harmless and even socially beneficial have the better of the argument over those who feel the drug is harmful and socially most undesirable. The Court is not the legislature and the legislature has spoken. It is sufficient to determine and the Court so finds that Congress had a rational basis for passing the Act and that there is a substantial body of informed expert opinion which continues to support and indeed to underline and emphasize the very reasons that led Congress to enact the law in the first instance. The Marihuana Tax Act is still based on reason, it is directed against a continuing social and health problem and the purposes of the statute cannot be accomplished without continued full enforcement. There is also a clear and compelling interest in the regulation of the transfer and possession of LSD.[11] The drug is more harmful than marihuana and defendant's religious interest

in its ingestion does not outweigh the threat to the public health and safety which LSD presents. The free exercise clause of the First Amendment does not prohibit the prosecution of this defendant under either Act. The practice of her beliefs—if beliefs they be—must give way to the public good.

The Supreme Court has stated that "a sufficiently important governmental interest" can justify limitations on First Amendment freedoms. In United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. (1968), the Court found that:

> "To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if * * * it furthers an important or substantial governmental interest. * * *" 391 U.S. at 376, 88 S.Ct. at 1679 (Footnotes omitted).

As part of her motion to dismiss the indictment on religious grounds, defendant has also made what may be broadly described as the "peyote" argument. The claim is that she is denied equal protection in the constitutional sense because members of another religion are permitted under the narcotic laws to use peyote, a similar and at least as harmful an hallucinatory drug.

In People v. Woody, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964), the California Supreme Court broadly applied the tests of Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and held that a state statute prohibiting the unauthorized use of peyote[12] could

---

11. For materials dealing with the effects of LSD and its relative potential for harm, see Appendix A to this Opinion.

12. "Peyote's principal constituent is mescaline. When taken internally by chewing the buttons or drinking a derivative tea, peyote produces several types of hal-

lucinations, depending primarily upon the user. In most subjects it causes extraordinary vision marked by bright and kaleidoscopic colors, geometric patterns, or scenes involving humans or animals. In others it engenders hallucinatory symptoms similar to those produced in cases

449

not constitutionally be applied to a member of the Native American Church. The Native American Church, made up of from 30,000 to 250,000 American Indians, had a "long history" of the use of peyote. The court found that:

> "Although peyote serves as a sacramental symbol similar to bread and wine in certain Christian churches, it is more than a sacrament. Peyote constitutes in itself an object of worship; prayers are directed to it much as prayers are devoted to the Holy Ghost. On the other hand, to use peyote for nonreligious purposes is sacrilegious. * * *" 40 Cal.Rptr. 69 at 73, 394 P.2d 813 at 817.

Against the "virtual inhibition of the practice of defendants' religion" imposed by the state statute, the California court balanced the state's interest in enforcing the statute in order to determine whether that interest was so "compelling" as to necessitate "an abridgement of defendants' First Amendment right." The court found that the record did not support "the state's chronicle of harmful consequences of the use of peyote" and held in favor of an exemption for the defendant members of the Native American Church.[13]

▮ Defendant asserts that marihuana is less harmful, or no more harmful, than peyote and that under the reasoning in *Woody*, she is entitled to an exemption from the Marihuana Tax Act. This Court, however, is not bound by decisions of the California Supreme Court. While it may appear incongruous that the court found, on the one hand, that the state had not shown that peyote had harmful consequences and yet found, on the other hand, that peyote "engenders hallucinatory symptoms similar to those produced in cases of schizophrenia, dementia praecox, or paranoia"—that problem is not before the Court. The concern here is to analyze the scheme and effects of the federal statutes under which Kuch has been indicted.

The Commissioner of Food and Drugs has exempted peyote, when used by the Native American Church, from regulation under the Drug Abuse Control Amendments to the Federal Food, Drug and Cosmetic Act. 21 U.S.C. § 360a (f) (1) of the Act reads as follows:

> "The Secretary may by regulation exempt any depressant or stimulant drug from the application of all or part of this section when he finds that regulation of its manufacture, compounding, processing, possession, and disposition, as provided in this section or in such part thereof, is not necessary for the protection of the public health."

21 CFR § 166.3 contains a list of drugs which the Commissioner of Food and Drugs, pursuant to authority given him by the Secretary of Health, Education and Welfare, has found to be depressant or stimulant within the meaning of 21 U.S.C. § 321 (v) (3). 21 CFR § 166.3 (c) (3) lists peyote because of its hal-

of schizophrenia, dementia praecox, or paranoia. Beyond its halluncinatory effect, peyote renders for most users a heightened sense of comprehension; it fosters a feeling of friendliness toward other persons." Woody, 40 Cal.Rptr. at 72–73, 394 P.2d at 816–817.

similar result has been achieved by ... in Montana and New Mexico and ... decree in Arizona. See, New ... (1959) 54–5–16; Mon... 94–35–123; Arizona ... 4098, Coconino

However, the Supreme Court of North Carolina, in State v. Bullard, 267 N.C. 599, 148 S.E.2d 565 (1966), has recently upheld the conviction of a member of the Neo-American Church for illegally possessing peyote and marihuana. In *Bullard*, the defendant described the Neo-American Church as part of the peyote religion and sought to take advantage of the *Woody* decision. The North Carolina court rejected *Woody* and decided the free exercise question on the basis of the act/belief distinction set forth in Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878).

lucinogenic effects and then concludes with the following language:

"The listing of peyote in this sub-paragraph does not apply to non-drug use in bona fide religious ceremonies of the Native American Church; however, persons supplying the product to the Church are required to register and maintain appropriate records of receipts and disbursements of the article."[14]

Because of the exemption, defendant claims that to deny her a judicial exemption from the Marihuana Tax Act is a denial of the equal protection of the laws in violation of the due process clause of the Fifth Amendment.[15] This argument is both novel and unpersuasive for several reasons.

Each of the equal protection cases cited by the defendant involves a single statute, either state or federal. In each case, the statute, as interpreted, was held unconstitutional either because the legislative classification contained therein was impermissible or the statute was not administered even-handedly. A threshold question arises in this case, therefore, as to which statute the defendant can claim is unconstitutional.

The Marihuana Tax Act was passed in 1937, some 28 years before the Neo-American Church was incorporated in California. There is nothing whatsoever on the face of the statute or in its legislative history which indicates that Congress intended to discriminate in any way against a religious group. The Act distinguishes solely between medical and related persons, on the one hand, and the general public on the other. Furthermore, the Act has been administered even-handedly. There are no provisions permitting an exemption for religious use and no such exemption has been given.

The Federal Food, Drug, and Cosmetic Act does not apply to marihuana. Congress presumably found it unnecessary to bring marihuana under the Food and Drug Act since it was already subject to the regulatory provisions of the Marihuana Tax Act and had been for 28 years. There is, again, nothing in the legislative history of the amendments to the Act which indicates that Congress intended to discriminate against those who sought to use marihuana for religious purposes. Marihuana is simply not covered. No exemption for the use of marihuana may be given and no such exemption has been given. LSD, peyote, and a number of other hallucinogens *are* covered by the Food and Drug Act.[16] Since a limited exemption has been given for the use of peyote, it is conceivable that the Neo-American Church, and this defendant, could have obtained a limited exemption for the use of LSD. The record does not show, however, that defendant has ever applied for, and been denied, such an exemption. Clearly, then, she cannot, at this point, argue that the Food and Drug Act is administered so as to deny her

14. This exemption was written into the Drug Abuse Control Amendments of 1965 as they were reported out of the House of Representatives. H.R. No. 130, 89th Cong., March 2, 1965, U.S.Code Cong. & Admin.News 1965, p. 1895. The exemption was removed by the Senate and accomplished by means of the regulation, which was published at 31 F.R. 4679 along with the following comment: "On the basis of comments received from various branches of the Native American Church, the Commissioner exempts the Church from the registration and recordkeeping requirements of the act for the possession of peyote for bona fide religious ceremonies."

15. Defendant cites Bolling v. Sharpe, 347 U S. 497, 74 S.Ct. 693, 98 L.Ed. 884

(1954); Hurd v. Hodge, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948); and Hobson v. Hansen, 265 F.Supp. 902 (1967) for the proposition that the equal protection clause of the Fourteenth Amendment applies to the United States Government through the due process clause of the Fifth Amendment.

Defendant relies on Yick Wo v. Hopkins, 118 U.S. 356, 68 S.Ct. 1064, 30 L.Ed. 220 (1886); Skinner v. State of Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); and Levy v. of Louisiana, 391 U.S. 68, 88 S. 20 L.Ed.2d 436 (1968) as s equal protection argum

16. 21 C.F.R. 166 2 DET, D Peyot

either the use of marihuana or LSD and thereby deny her the equal protection of the laws.

Defendant, however, argues that it is a combination of both the Marihuana Tax Act and the Food and Drug Act which results in a denial of her constitutional rights, pressing the argument primarily with respect to marihuana. Her position is that marihuana is no more harmful than peyote and that the United States Government, and the Federal Courts, cannot permit a religious exemption for one without a corresponding exemption for the other. She does not argue in this connection that either statute standing alone is unconstitutional but, rather, that "the laws" are unconstitutional as applied to her in that they do not similarly treat those who are similarly situated. While it would appear that this argument is not, in fact, an equal protection argument but, rather, a novel attempt to take a second bite at the free exercise apple, the prohibited use of marihuana by the Neo-American Church is readily distinguished from the permissive use of peyote by the Native American Church and no constitutional discrimination is present.

The Court must assume that the FDA in granting the peyote exemption acted within its delegated authority. Under the statute the FDA could exempt peyote only if the Commission determined after hearing that the regulation and control of the drug otherwise required by the statute was "not necessary for the protection of the public health." No such determination has been made as to LSD by the FDA. As to marihuana, Congress, rather than delegating responsibility to the FDA, itself determined that there was a clear hazard to health in the use of the drug. That this legislative determination still has validity and a wholly rational basis is demonstrated by the materials submitted to the Court at the hearing on the motion of which the

Court takes judicial notice. It is not the function of the Court to go any further behind this legislative determination as to marihuana any more than it will be possible in this proceeding to review the basis for the FDA peyote regulation.

In short there is nothing before the Court except a claim of equal protection premised on the fact that there has been a rational determination that the acts of one religion, the Neo-American Church, are hazardous to health and the acts of another are not. There is no purpose to interfere with the beliefs of either.

Several other issues are raised not based on the religious aspects of the case which do not require detailed consideration at this time. As to counts 1, 2 and 7 relating to the use of marihuana, it is claimed that the Marihuana Tax Act is unconstitutional because it infringes defendant's rights to be protected against self-incrimination under the Fifth Amendment. This is a troublesome question in the light of *Marchetti, Grosso* and *Haynes*.[17] Numerous motions to the same effect have been filed in other cases in this Court and the matter is now before the Court of Appeals for the District of Columbia in another case, e. g., Bartol v. United States, No. 21,487 (1968), and the Supreme Court of the United States has granted certiorari on this issue in *Leary*. This contention should not be considered in the absence of the underlying facts as they will develop at the trial and in the light of the decisions in similar cases which by then will be available. Kuch asks that her case be delayed until the issue is resolved by the higher courts but this is not appropriate. She must face trial on the LSD counts in any event and the case should progress in normal fashion. Accordingly, this aspect of the motions will also be denied at this time without preju-

17. Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968).

dice to renewal before the trial judge in the light of decisions and facts then available.

Finally, it is contended that felony counts 1 and 7 should be dismissed since the prosecutor could have relied on District of Columbia Code 33–402(a) to prosecute for a misdemeanor and this provision should take special precedence in the District to avoid a denial of equal protection under the law. This contention is without merit. Hutcherson v. United States, 120 U.S.App.D.C. 274, 345 F.2d 964 (1965).

Thus in summary the Court concludes that the motions to dismiss in all respects are denied. The Neo-American Church is not an establishment of religion and defendant Kuch has not sustained her burden of demonstrating that her religious beliefs require her to ingest psychedelic drugs. Accepting her contrary contentions on these issues, however, she still cannot prevail for the statutes under which she stands indicted are in aid of a substantial government interest and have a rational and constitutional basis. These laws, enacted to preserve public safety, health and order, will be enforced. On the proofs before the Court the statutes are unrelated to the suppression of religion or religious beliefs and there is no denial of defendant's rights under the Constitution of the United States.

Counsel shall submit an appropriate order in seven days.

## APPENDIX A

The Court takes judicial notice of the following expert scientific opinion:

Report of the President's Commission on Crime in the District of Columbia, pp. 562 et seq. (1966);

Bloomquist, E. R., *Marihuana: Social Benefit or Social Detriment?*, 106 Calif. Medicine 346–353 (May, 1967);

Eddy, Halbach, Isbell and Seevers, *Drug Dependence: Its Significance and Characteristics*, 32 Bull. World Health Organization 721–733 (1965);

Allentuck and Bowman, *Psychiatric Aspects of Marihuana Intoxication*, American Journal of Psychiatry, Sept. 1942;

Louria, *Nightmare Drugs*, (Pocket Books, Inc., 1966), pp. 32–33;

Maurer and Vogel, *Narcotics and Narcotics Addiction*, (1954, 1962), pp. 111–113, 243;

*Dependence on Cannabis (Marihuana)*, Committee on Mental Health and Committee on Alcoholism and Drug Dependence of the American Medical Association, 201 J.A.M.A. 368 (August 7, 1967);

Chapple, *Cannabis, A Toxic and Dangerous Substance—A Study of Eighty Takers*, 61 British J. of Addiction 273–79 (1966);

Ball, *Marihuana Smoking and the Onset of Heroin Use*, Committee on Problems of Drug Dependence, National Academy of Science, National Research Council, p. 5102 (1967);

Munch, *Marihuana and Crime*, United Nations, Bulletin on Narcotics, Vol. 18, No. 2 (April–June 1966);

United Nations Economic and Social Council, 44th Sess., Document No. E. 4516, May 17, 1968.

Solomon, *The Marihuana Papers*, Signet Books, 1966;

Livingston, *Narcotic Drug Addiction Problems*, U. S. Public Health Service Publication No. 1050;

Clark, *Religious Aspects of the Psychedelic Substances and the Law*, Parasychology, p. 32 (March, 1967).