[No. 21805-4-II. Division Two. April 17, 1998.]

THE STATE OF WASHINGTON, *Petitioner*, v. GENE R. BALZER, *Respondent*.

46

*Bernardean Broadous, Prosecuting Attorney*, and *William J. Halstead* and *Jon Tunheim, Deputies*, for petitioner.
*Robert M. Quillian* and *Thomas E. Doyle*, for respondent (appointed counsel for appeal).

HOUGHTON, C.J. — The State charged Gene Balzer with two counts of unlawful possession of a controlled substance, marijuana and cocaine, and one count of unlawful possession with intent to deliver (marijuana). Balzer notified the trial court that he planned to assert an affirmative defense under the Religious Freedom Restoration Act (RFRA), specifically, that he possessed the marijuana for religious purposes.[1] The trial court held a hearing to determine whether the defense applied, and after hearing testimony from Balzer and the arresting officer, ruled that Balzer had established a prima facie case for the defense and that the jury would be instructed accordingly.

Balzer also asserted unwitting possession as an affirmative defense to the charge of possession of cocaine. In its jury instructions, the trial court ruled the State would have to prove the absence of unwitting possession beyond a reasonable doubt.

During the lunch hour recess, the State petitioned this court for emergency interlocutory review of the trial court's jury instructions. While a commissioner of this court considered the request, the trial court instructed the jury and partial summations were presented. The commissioner granted review and stayed further trial proceedings.

The State contends that the trial court erred in: (1)

---

[1]Although Balzer filed notice of his intent to assert an affirmative defense under the RFRA, he failed to make a timely motion for a pretrial hearing. On short notice, then, the trial court held a hearing the morning of the trial giving the State little time to prepare for the hearing.

instructing the jury on Balzer's affirmative defense that his possession and possession with intent to deliver marijuana was based upon religious free exercise, and (2) instructing the jury that the State had to prove the absence of the unwitting possession defense beyond a reasonable doubt. We agree and reverse on both grounds.

## FACTS
### Background

On November 24, 1996, an Olympia police officer, Donald Heinze, stopped Balzer for a traffic infraction. Upon approaching Balzer's car, Officer Heinze noticed a strong aroma of fresh marijuana emanating from inside the car. The officer asked Balzer several times if he had marijuana in the vehicle, but Balzer consistently replied no. A search of the car revealed a black canvas bag on the passenger side floor. Another officer who arrived at the scene arrested Balzer. Balzer did not tell the officers at this time that he possessed marijuana for religious purposes.

After placing Balzer under arrest, the officers continued searching the car. They opened the large black canvas bag and found a large plastic bag inside, which contained numerous smaller zip-loc bags. Seven of these small plastic bags contained marijuana, while several other bags contained only trace amounts. The marijuana discovered weighed less than a kilogram.

The officers also found $404, a day-planner sheet with the phrase "People Who Dogged Me" written at the top with several names and numbers written below, and a small plastic container of cocaine in the ashtray. The officers then took Balzer to the police station, where he voluntarily gave a statement and for the first time told them that he possessed the marijuana for religious purposes.

On November 27, 1996, the State charged Balzer with unlawful possession of more than 40 grams of a controlled substance. On February 14, 1997, Balzer filed notice of his intent to rely upon an affirmative defense under the RFRA.

The State also filed an amended information adding a count of unlawful possession of a controlled substance (cocaine) and possession of marijuana with intent to deliver.

Evidentiary Hearing

On the morning of trial, the court held a hearing to determine whether Balzer could assert a religious free exercise defense under the RFRA. At the hearing, Balzer testified that he has been a member of the Rainbow Tribe Church of Living Light (Rainbow Tribe Church) for 22 years and is currently a high priest.[2] Balzer proffered a photocopy of a page from THE ENCYCLOPEDIA OF AMERICAN RELIGIONS recognizing the Rainbow Tribe Church as an established religion that allows use of psychoactive drugs and plants in prayer ceremonies. Balzer also testified that he has been a member of the Rastafarian religion for the past five years, which, like his other faith, utilizes marijuana as a sacrament during ceremonies.

Balzer stated that he uses religious sacraments, including marijuana, in practicing both religions. Specifically, he stated that he uses these plants during ceremonial prayer circles with other church members for the purpose of achieving a "higher group consciousness." The group ingests psychoactive plants during the prayer circles, Balzer explained, to "create more of a positive vibration and radiate it out" to people who need it for "healing purposes" and "guidance." According to Balzer, ingestion of marijuana "enhances the higher reasoning side of the mind and the higher self. It frees the spirit to reach its highest potential in deep meditation or prayer, and it helps us commune with our creator."

Furthermore, the group does not ingest such plants, Balzer testified, simply for "getting high or getting loaded or

---

[2]Regarding his status as a priest, Balzer stated his position is not elected by the church members but, essentially, is self-elected. As Balzer explained, one becomes a priest by "one's personal living, . . . faith and following of their [sic] spirit, and [by] helping others" realize their highest mental and spiritual abilities.

loafing around." He insisted the practice is "a very high spiritual matter" and that the group uses the psychoactive plants solely for religious purposes. Balzer said that church members "try to stay within [their] . . . tribe" and do not share the drugs with children or encourage use by other younger individuals. Finally, Balzer said his religion is "very personal" and that he used marijuana believing his practices were protected under the RFRA.

Officer Heinze testified that during his 11 years in law enforcement, he had considerable experience dealing with drug possession and trafficking. He stated that he investigated and witnessed "devastation in families, children, car crashes, suicide" and a host of other tragedies all in which narcotics have played a significant role. In his view, the use of drugs has become "more and more dangerous" to society.

## Pretrial Ruling

Based upon Balzer's testimony, the trial court determined, by a preponderance of the evidence, that Balzer had established a prima facie case for his "religious use" defense, and was therefore entitled to a jury instruction corresponding to his defense. Relying upon *United States v. Bauer*, 75 F.3d 1366 (9th Cir. 1995), and the "accepted scholarship of THE ENCYCLOPEDIA OF AMERICAN RELIGIONS," the court concluded that Balzer's use of marijuana was for religious purposes, and that his religious beliefs were sincerely held and central to his religious practices. The court also referred to *Munns v. Martin*, 131 Wn.2d 192, 930 P.2d 318 (1997), noting Washington's constitutional religious protections, and concluded the State had not shown a compelling interest justifying the regulation of marijuana or that application of the laws were the least restrictive means for achieving that interest.

## Trial Testimony and Jury Instructions

During trial, Balzer gave testimony similar to his test-

imony at the evidentiary hearing regarding his use of marijuana. But he added that he has studied the use of marijuana in religious practices, listing numerous books he has read. Balzer also explained that he drew significantly from other religions using marijuana, such as the Native American and Rastafarian churches.

Regarding the cocaine, Balzer testified that the cocaine found in the ashtray belonged to a friend to whom he lent his car earlier that day. The first time Balzer learned of the cocaine, he asserted, was at the time the officers discovered the substance while searching his car.

At the close of trial, the court ruled that Balzer could assert his religious practices as an affirmative defense with regard to possession of marijuana as well as possession with intent to deliver. Concerning the unwitting possession defense instruction as to the cocaine, the trial court ruled the State would have to disprove Balzer's affirmative defense beyond a reasonable doubt.

## ANALYSIS
## I. RELIGIOUS FREE EXERCISE

Applying the factors set forth in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4TH 517 (1986), Balzer seeks protection under the Free Exercise Clause of the Washington Constitution, which, he contends, affords him greater protection than under the federal constitution.

Religious free exercise embraces two concepts: the freedom to believe and the freedom to act. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213, 128 A.L.R. 1352 (1940). The first is absolute while the second, by the nature of our democracy, cannot be. *Id.* at 303-04. An individual's conduct, therefore, remains subject to regulation for the protection of society. *Id.* at 304. The freedom to act must have appropriate definition to preserve the enforcement of that protection, and, in turn, exercise of the power to regulate must not unduly impose on protected freedom. *Id.*

Constitutional protection for religious free exercise under state law embodies these principles. Article I, section 11 of the Washington Constitution provides in pertinent part that:

[a]bsolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state.

As the Supreme Court noted in *First Covenant Church v. City of Seattle*, 120 Wn.2d 203, 226, 840 P.2d 174 (1992), article I, section 11 of our Constitution is more protective of religious freedom than the First Amendment of the federal Constitution. *See also State v. Waters*, 89 Wn. App. 921, 951 P.2d 317 (1998); *In re Marriage of Jensen-Branch*, 78 Wn. App. 482, 491, 899 P.2d 803 (1995).[3] Consequently, as a fundamental right of "of vital importance," *First Covenant*, 120 Wn.2d at 226, any burden upon religious free exercise must withstand strict scrutiny. *Munns*, 131 Wn.2d at 199; *First United Methodist Church v. Hearing Examiner*, 129 Wn.2d 238, 246, 916 P.2d 374 (1996).

Under this standard, the complaining party must first prove the government action has a coercive effect on his or her practice of religion. *Munns*, 131 Wn.2d at 199. Once a coercive effect is established, the burden of proof then shifts to the government to demonstrate the restrictions serve a compelling state interest and are the least restrictive means for achieving that interest. *Id.* If this standard cannot be

---

[3]Protection for religious free exercise under the Washington Constitution is greater than federal constitutional protection particularly in light of the U.S. Supreme Court's recent invalidation of the Religious Freedom Restoration Act in *City of Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997). *Boerne* effectively reinstated the less protective standard of *Employment Div. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990).

satisfied, the restriction is unconstitutional. *Id.*

## A. Coercive Effect

The first prerequisite to a free exercise challenge requires the complaining party to demonstrate that his or her religious convictions are sincerely held and central to the practice of his or her religion. *Munns*, 131 Wn.2d at 199; *see State v. Motherwell*, 114 Wn.2d 353, 788 P.2d 1066 (1990); *Backlund v. Board of Comm'rs*, 106 Wn.2d 632, 639, 724 P.2d 981 (1986). The court will not inquire further into the truth or reasonableness of the party's convictions or beliefs. *Munns*, 131 Wn.2d at 199; *see Backlund*, 106 Wn.2d at 640 ("Courts have nothing to do with determining the reasonableness of the belief.") (citations and internal quotes omitted). Moreover, where an individual's beliefs are "arguably religious," the court will recognize and consider them for purposes of constitutional analysis. *International Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 439 (2d Cir. 1981); *see also* Laurence H. Tribe, American Constitutional Law § 14-16, at 828 (1978).

Next, the party seeking protection must demonstrate that the challenged enactment burdens his or her free exercise of religion. *Munns*, 131 Wn.2d at 200. An enactment unduly burdens free exercise if its "coercive effect . . . operates against a party in the practice of his [or her] religion." *Id.*; *First Covenant*, 120 Wn.2d at 226. Therefore, a facially neutral, evenhandedly enforced statute that does not directly burden free exercise may nonetheless violate article I, section 11 if it indirectly burdens the exercise of religion. *First Covenant*, 120 Wn.2d at 226.

Here, the trial court determined that Balzer's beliefs were sincere and central to the practice of his respective religions. The trial court reached this conclusion largely based upon Balzer's own detailed testimony. Balzer's sincerity is questionable. On the one hand, he gave a detailed account of his religious beliefs, providing the court

with evidence of the Rainbow Tribe and Rastafarian faiths as established religions. He also substantiated his knowledge of the religious usage of marijuana by noting numerous books written on the issue.[4] On the other hand, the evidence presented at trial indicates that his marijuana use may simply be a way of life, that is, an activity engaged in as part of his life-style, and that he does not use marijuana solely for religious purposes. For instance, he admitted that he personally used the drug for medicinal purposes and also sold the drug to others for medical treatment for terminal illnesses, mental conditions, and chemical dependencies. He also testified that he used marijuana at a party the night before his arrest although some members of his church were present.

Thus, the sincerity and centrality of Balzer's religious beliefs are, at best, "arguably religious." But we neither judge the reasonableness of his beliefs nor question their verity. See *Munns*, 131 Wn.2d at 199; *Backlund*, 106 Wn.2d at 640 (reviewing court will not inquire further into truth or reasonableness of an individual's religious convictions). And so, for purposes of constitutional analysis, we consider his beliefs sincerely held and recognize his marijuana use as central to the practice of his religion. See *International Soc'y for Krishna Consciousness, Inc.*, 650 F.2d 430.

Given Balzer's beliefs as sincere and central to his religious practices, it is clear that restriction of his marijuana use burdens exercise of his religious practices; RCW 69.50.401[5] criminalizes possession and distribution of the drug even if for religious purposes. See RCW 69.50.401.

---

[4]In substantiating his knowledge of marijuana usage, Balzer referred to several books discussing the use of psychoactive drugs in religion, such as GREEN GOLD: THE TREE OF LIFE; MARIJUANA IN MAGIC AND RELIGION; CANNABIS SPIRITUALITY; PEYOTE RELIGION BOOK; PLANTS OF THE GODS; HEMP: THE MARIJUANA CONSPIRACY; THE EMPEROR WEARS NO CLOTHES; PSYCHEDELIC SHAMANISM; and THE HEMP REVOLUTION.

[5]RCW 69.50.401 proscribes marijuana use and distribution. This statute has withstood constitutional scrutiny, and represents a valid exercise of the State's police power. See *State v. Smith*, 93 Wn.2d 329, 337, 610 P.2d 869, *cert. denied*, 449 U.S. 873, 101 S. Ct. 213, 66 L. Ed. 2d 93 (1980).

## B. Compelling State Interest

Once the complaining party establishes a burden upon religious free exercise, the court determines if the burden is offset by a compelling state interest served by the least restrictive means to achieve that interest. *Munns*, 131 Wn.2d at 200. "Compelling interests" are those governmental objectives based upon the necessities of national or community life such as threats to public health, peace, and welfare. *Id.* (citing *First Covenant*, 120 Wn.2d at 226-27). Thus, if the government demonstrates it has a compelling interest in enforcing the enactment for the peace and safety of the state, that interest will justify infringement upon Balzer's religious free exercise. *Id.* at 201; *see also* WASH. CONST. art. I, § 11 (The "freedom of conscience in all matters of religious sentiment, belief and worship . . . shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state.").

 Under article I, section 1 of the Washington Constitution, the Legislature may prescribe laws to promote the health, peace, safety, and general welfare of the people of Washington. *State v. Ward*, 123 Wn.2d 488, 508, 869 P.2d 1062 (1994). Broad discretion is thus vested in the Legislature to ascertain the demands of public interest and to select measures necessary to secure and protect the same. *Id.* at 508.

### 1. State's Regulatory Power in Other Context Overriding Religious Free Exercise

Courts have repeatedly concluded that the State has a compelling interest where it enforced laws under its police power even though enforcement burdened the free exercise

of religion. For instance, in *Backlund*, 106 Wn.2d 632, the Supreme Court determined that the State had a compelling interest in requiring hospital staff to purchase professional liability insurance contrary to the complaining physician's religious beliefs. The court stated that:

every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. . . . In the area of health and safety, governmental interests often override individual objections to regulations relating thereto.

*Id.* at 642. The court held, thus, that health and welfare regulations curtailing the free exercise of religion were justified. *Backlund*, 106 Wn.2d 632.

Similarly, in *State v. Norman*, 61 Wn. App. 16, 808 P.2d 1159, *review denied*, 117 Wn.2d 1018, 818 P.2d 1099 (1991), the court held that a parent's refusal to provide medical treatment to his child based upon religious beliefs was inconsistent with the peace and safety of the State. "The peace and safety of the state," the court declared, "involve the protection of the lives and health of its children, as well as the obedience to its laws." *Id.* at 23. The court held that conduct motivated by religious sentiment may be subject to regulation if that conduct conflicts with the exercise of the interests of third parties in the interests of health and safety. *Id.* at 24.

Courts have also found compelling interests overriding religious free exercise in a number of other situations. *See e.g., State v. Meacham*, 93 Wn.2d 735, 612 P.2d 795 (1980) (State has a compelling interest in requiring blood tests for putative fathers, under the Uniform Parentage Act, although providing blood was against the complaining parties' religious beliefs); *State ex rel. Holcomb v. Armstrong*, 39 Wn.2d 860, 239 P.2d 545 (1952) (State has a compelling interest in state university rule requiring an Xray of all incoming students for tuberculosis despite beliefs of a Christian Scientist student); *State v. Clifford*, 57 Wn. App. 127, 787 P.2d 571, *review denied*, 114 Wn.2d 1025, 792 P.2d

535 (1990) (State has a compelling interest in requirement for a driver's license despite complaining party's religious belief that licensing requirement placed state on same level as God).

Here, the State asserts an interest in enforcing laws criminalizing the use and possession of Schedule I drugs, such as marijuana. But the trial court determined that the State failed to establish a compelling interest that justified infringing upon Balzer's religious free exercise because of the insufficiency of evidence presented at the pretrial hearing. More specifically, the trial court refused to recognize a compelling state interest largely based upon the testimony of an individual police officer attesting to his personal observations and conceptions of marijuana's harmfulness.[6]

On appeal, however, we may take judicial notice of legislative facts to reach our legal conclusions despite an inadequate factual basis in the trial record.[7] *See Wyman v. Wallace*, 15 Wn. App. 395, 549 P.2d 71 (1976), *aff'd*, 94 Wn.2d 99, 615 P.2d 452 (1980). "[L]egislative facts" are social, economic, and scientific realities or facts that enable the court to interpret the law. *Wyman v. Wallace*, 94 Wn.2d 99, 102, 615 P.2d 452 (1980); *see also Houser v. State*, 85 Wn.2d 803, 807, 540 P.2d 412 (1975), *overruled on other grounds, State v. Smith*, 93 Wn.2d 329, 610 P.2d 869 (1980) (legislative facts supply premises in the process of legal reasoning). An appellate court has the power to take judicial notice of legislative facts sua sponte; the court is

---

[6]As noted above, the State did not have adequate preparation time for the pretrial hearing, which explains why the only substantial evidence presented to demonstrate its interests in regulating marijuana was Officer Heinze's testimony.

[7]We also note that the trial court could have taken judicial notice of legislative facts identifying the effects and dangers of marijuana use. *See generally Wyman v. Wallace*, 94 Wn.2d 99, 102, 615 P.2d 452 (1980); *In re Marriage of Campbell*, 37 Wn. App. 840, 845, 683 P.2d 604 (1984) (a court can take judicial notice of legislative facts that enable the court to interpret the law); 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 41 cmt. 49 (3d ed. 1989). Judicial notice of such facts would have been particularly appropriate here because the State was afforded little time to prepare for the pretrial evidentiary hearing.

not limited to only those legislative facts furnished by the parties. *See* 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 49 (3d ed. 1989); *see generally* McCORMICK ON EVIDENCE § 331 (John W. Strong ed., 4th ed. 1992). As the commentaries to ER 201(a) and FED. R. EVID. 201(a) explain, it is essential that courts have unrestricted ability to employ judicially noticed "legislative facts" in formulating legal principles. *Wallace*, 94 Wn.2d at 103.

Accordingly, in the present case, in addition to the testimony presented to the trial court, we take judicial notice of marijuana's effects and harmfulness as evidenced by legislative assessments expressed in both state and federal case law. *See United States v. Kuch*, 288 F. Supp. 439 (D. D.C. 1968) (taking judicial notice of the health hazards involved in marijuana use).

*2. State's Assessment of Marijuana as a Harmful Drug*

In 1971, Washington adopted the Uniform Controlled Substances Act (Uniform Act), RCW 69.50, which substantially parallels the federal comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 (Supp. 1996). *Seeley v. State*, 132 Wn.2d 776, 782, 940 P.2d 604 (1997). Both statutory schemes classify marijuana as a Schedule I controlled substance, providing that its use and possession is illegal under all circumstances with limited exceptions for research. *Seeley*, 132 Wn.2d at 782-83; *see* RCW 69.50.204(c)(14); 21 C.F.R. § 1308.11(d)(19). Similar to the federal statute, the Uniform Act classifies controlled substances based upon their therapeutic value, potential for abuse, and safety. *Seeley*, 132 Wn.2d at 783-84. A substance is listed in Schedule I if it has (1) a high potential for abuse, (2) no currently accepted medical use in treatment in the United States, and (3) no accepted safety for use in treatment under medical supervision. RCW 69.50.201.

Since the Legislature initially classified mari-

júana as a Schedule I drug in 1971,[8] *Seeley*, 132 Wn.2d 784, courts addressing the use of marijuana have consistently deferred to this classification, that is, to the Legislature's determination that marijuana use is dangerous and harmful. These cases, although addressing marijuana use in the context of a rational basis analysis, underscore the deference courts have given to the Legislature's determinations.

For instance, in *State v. Dickamore*, 22 Wn. App. 851, 855, 592 P.2d 681 (1979), the defendant argued that the classification of marijuana as a Schedule I drug violated due process and equal protection. Rejecting these arguments, the Court of Appeals stated that

> so long as scientists disagree about the effect of marijuana, the [L]egislature is free to adopt the opinions of those scientists who view marijuana as harmful. We will not substitute our judgment for that of the [L]egislature where the statute in question bears a rational relationship to a legitimate legislative purpose.

Similarly, in *Smith*, 93 Wn.2d 329, individuals appealing criminal convictions made an equal protection challenge to the Legislature's classification of marijuana, providing the court with evidence of marijuana's safety. *Id.* at 337. Noting that experts disagreed about the seriousness of marijuana's effects, the Supreme Court nonetheless stated that "[m]arijuana creates a euphoric state of intoxication which impedes learning, incentive, efficiency, and . . . motor coordination." *Id.* at 338.

Moreover, the court emphasized the Legislature's right to exercise its police power in regulating the prescription and use of dangerous drugs and found that the classification was reasonably related to legitimate state interests. *Id.* at 338-39. In the court's view, the Legislature's authority in regulating use of dangerous and habit-forming drugs could not be questioned because the right to exercise this power is "manifest in the interest of the public health and welfare." *Id.* at 337. Hence, when the Legislature acts

---

[8]Every state has classified marijuana as a Schedule I drug.

under its police power, constraints placed upon individual freedom serve to "protect both society generally and the individual personally from the perceived harm." *Id.* at 333-39. And thus, as the court stated, it is not the court's "proper function to substitute . . . [its] judgment for that of the [L]egislature with respect to the necessity of these constraints." *Id.* at 338.

In *Seeley*, 132 Wn.2d 776, a cancer patient, who sought to use marijuana to control the side effects of chemotherapy, filed suit, contending the classification of marijuana violated several constitutionally guaranteed rights. Rejecting all of his arguments, the court determined that substantial evidence supported the Legislature's classification and

> decline[d] to interfere with the broad judicially recognized prerogative of the Legislature, particularly where the challenged legislation involves a myriad of complicated medical, physiological, and moral issues; . . . . The debate over the proper classification of marijuana belongs in the political arena.

*Seeley*, at 813-14. Accordingly, the court refused to undermine the legislative classification of marijuana as a Schedule I controlled substance.

### 3. Congressional Assessment of Marijuana as a Harmful Drug

Several federal cases discuss compelling governmental interests relative to marijuana use in the context of religious free exercise and have refused to create free exercise havens from violation of criminal laws regulating marijuana use and possession. In each case, the court concluded the state's interests were compelling.

In *United States v. Rush*, 738 F.2d 497 (1st Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985), members of the Ethiopian Zion Coptic Church claimed that marijuana use was an integral part of their religious practices and that laws

criminalizing marijuana use and possession burdened their sincerely held beliefs. The First Circuit disagreed. The court stated that "[i]n enacting substantial criminal penalties for possession with intent to distribute [marijuana], Congress has weighed the evidence and reached a conclusion which it is not this court's task to review de novo." *Id.* at 512. Moreover, the court cited numerous federal cases that likewise had

> accepted the congressional determination that marijuana in fact poses a real threat to individual health and social welfare, and has upheld the criminal sanctions for possession and distribution of marijuana even where such sanctions infringe[d] on the free exercise of religion.

*Id.* Accordingly, the court "decline[d] to second-guess the unanimous precedent establishing an overriding governmental interest in regulating marijuana." *Id.* at 512-13.

Similarly, in *United States v. Middleton*, 690 F.2d 820 (11th Cir. 1982), *cert. denied*, 460 U.S. 1051 (1983), the defendant argued his use of marijuana was protected under religious free exercise. As here, he claimed that use of marijuana was an indispensable part of his religion and that criminalization of the drug's use and possession violated his constitutional rights. *Id.* at 822. Addressing the federal classification of marijuana as a Schedule I drug, the court disagreed, stating that Congress had "strongly and clearly expressed its intent to protect the public from the obvious danger of drugs . . . [that] it determines to be dangerous, even if those drugs are to be used for religious purposes." *Id.* at 825. Furthermore, in the court's view, "both the fact of legislation and the severity of the penalties provided in statutes . . . clearly evidence[d] 'the grave concern of Congress' in controlling the use of drugs." *Id.* (quoting *Leary v. United States*, 383 F.2d 851 (5th Cir. 1967)). Continuing, the court quoted a noteworthy excerpt from *Leary*, 383 F.2d 851:

> Congress has demonstrated beyond doubt that it believes

[that] marihuana is an evil in American society and a serious threat to its people. It would be difficult to imagine the harm which would result if the criminal statutes against marihuana were nullified as to those who claim the right to possess and traffic in this drug for religious purposes. For all practical purposes the anti-marihuana laws would be meaningless, and enforcement impossible. The danger is too great, especially to the youth of the nation . . . for this court to yield to the argument that the use of marihuana for so-called religious purposes should be permitted under the Free Exercise Clause. We will not, therefore, subscribe to the dangerous doctrine that the free exercise of religion accords an unlimited freedom to violate the laws of the land relative to marihuana.

*Middleton*, 690 F.2d at 825 (quoting *Leary*, 383 F.2d at 860-61). According to the court, the government advanced a "clearly articulated and compelling interest[]" in regulating the possession and distribution of drugs such as marijuana, which outweighed its religious use. *Id.* at 825-26; *see also Leary*, 383 F.2d 851; *Kuch*, 288 F. Supp. 439.

Another case which involved the claim that criminalizing the possession and use of marijuana burdened the free exercise of religion is *United States v. Meyers*, 95 F.3d 1475 (10th Cir. 1996), *cert. denied*, 118 S. Ct. 583 (1997). Although the court applied the standard set forth in *Employment Div. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), instead of strict scrutiny, the court's rationale is persuasive. Quoting *Smith*, the court stated that enforcing " 'generally applicable prohibitions of socially harmful conduct . . . cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.' " *Meyers*, 95 F.3d at 1481 (quoting *Smith*, 494 U.S. at 885) (internal quotes omitted). In the court's view, " '[t]o make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is compelling—permit[s] him, by virtue of his beliefs, to become a

law unto himself.' " *Id.* (internal quotes omitted).[9]

In light of the substantial case law recognizing other compelling state interests in the context of religious free exercise, as discussed above, and considering the "social realities" of marijuana's effects and dangers, as recognized by the Legislature and Congress, we hold that the State has a compelling interest in its enforcement of laws regulating drugs listed as Schedule I substances. *See Mood for a Day, Inc. v. Salt Lake County*, 953 F. Supp. 1252 (D. Utah 1995) ("The compelling nature of the state's interest in fighting illegal drug use can hardly be questioned. Congress, state legislatures, courts, and other government entities have long recognized serious societal problems associated with the use and abuse of controlled substances, including marijuana.").

## C. Least Restrictive Means

Next, the State must demonstrate that regulation of marijuana is the least restrictive means for achieving its objectives. *Backlund*, 106 Wn.2d at 636. The State cites *Middleton*, 690 F.2d 820, *Kuch*, 288 F. Supp. 439, and *Olson v. DEA*, 878 F.2d 1458 (D.C. Cir. 1989), *cert. denied*, 495 U.S. 906 (1990)), and argues that there are no less restrictive means for protecting the health and safety of its citizens. We agree.

In *Olson*, the court considered a detailed proposal by the defendant to create an exemption for use of marijuana by the Ethiopian Coptic Church. The court rejected the proposal and summarily refused to accommodate or immunize the Ethiopian Coptic Church's use of marijuana in religious practices. *Id.* at 1462-63.

 In the present case, as in *Olson*, we refuse to accommodate and provide a constitutional harbor for Balz-

---

[9]*See also United States v. Hudson*, 431 F.2d 468, 469 (5th Cir. 1970), *cert. denied*, 400 U.S. 1011 (1971) ("[T]he use of drugs as part of religious practice is not constitutionally privileged.").

er's marijuana use for religious practices under either of his faiths. Extended to its logical conclusion, Balzer's assertion that his use of marijuana should be protected as religious free exercise necessarily invites other religious groups, whose use of prohibited drugs is likewise sincere and central to their religion, to seek constitutional protection.

Moreover, any "carving out" or other form of constitutional accommodation for the practices of the Rastafarian religion or Rainbow Tribe Church will encourage enlistment in those religions for the wrong reasons. That is, individuals who use marijuana or desire to use it for nonreligious purposes (e.g., recreationally or medicinally) will seek membership in these religions to invoke protection for their use that would otherwise be unlawful if not a member of those churches. Effectively—and significantly—laws restricting the use of marijuana will be rendered meaningless. *See Kuch*, 288 F. Supp. at 445 ("If individual religious conviction permits one to act contrary to civic duty, public health and the criminal laws of the land, then the right to be let alone in one's relief with all the spiritual peace it guarantees would be destroyed in the resulting breakdown of society."). We will not create a constitutional safe harbor for marijuana use because there is no realistic or sensible less restrictive means to regulate the use of marijuana. *See Meacham*, 93 Wn.2d at 740 (court must apply the religious free exercise doctrines in a manner both sensible and realistic). We therefore agree that there is no less restrictive means by which to regulate marijuana usage and distribution.

In sum, we note that religious liberty is indeed essential to enlightened opinion and conduct within a democratic citizenry, and that religious free exercise should develop and flourish unmolested and unobstructed under the shield of this liberty, especially in a country comprised of many races and creeds such as ours. *See Cantwell*, 310 U.S. at 310. But there are necessary limits to the exercise of such liberty. *Id.* The regulation of marijuana is clearly designed

to protect society as a whole. Although Balzer's freedom to believe in the religious use of marijuana is unfettered and absolute, *Holcomb*, 39 Wn.2d at 864, his use and distribution of the drug contravenes laws specifically and properly enacted for the health, morals, safety, and general welfare of the people of the state.[10] Accordingly, Balzer's free exercise of religion must yield to the "peace and safety of the state."[11] *See Norman*, 61 Wn. App. at 23; *see also Cantwell*, 310 U.S. at 306 (exercise of religion may be at some inconvenience so the state may protect its citizens from

---

[10]*Accord State v. Peck*, 143 Wis. 2d 624, 422 N.W. 2d 160 (Ct. App. 1988) (preservation of public health and safety is compelling interest and overrides free exercise in using marijuana as religious sacrament); *State v. Olsen*, 315 N.W. 2d 1 (Iowa 1982) (state has compelling interest in regulating use of marijuana which outweighs religious free exercise); *Whyte v. United States*, 471 A.2d 1018 (D.C. 1984) (interest in protecting society by enforcement of drug laws is compelling interest which outweighed defendant's interest in possession and distribution of marijuana for religious practices); *Randall v. Wyrick*, 441 F. Supp. 312 (W.D. Mo. 1977) (state has compelling interest in regulation of marijuana which outweigh religious free exercise rights since considerable scientific evidence supports notion that marijuana poses a substantial health hazard); *Lewellyn v. Oklahoma*, 489 P.2d 511 (Okla. Crim. App. 1971) (state has compelling interest in prohibiting distribution of marijuana, overriding guarantees of religious free exercise, because use of marijuana imposes a substantial risk to health and life).

[11]Our decision is consistent with case law discussing the use of peyote because, as some courts have held, marijuana use is distinguishable from the use of peyote by members of the Native American Church. For instance, as the court stated in *Rush*, the exemption for peyote is "properly viewed as a government effort toward accommodation for a readily identifiable, narrow category which has minimal impact on the enforcement of the laws in question." *Rush*, 738 F.2d at 513 (quoting *United States v. Lee*, 455 U.S. 252, 256-59, 102 S. Ct. 1051, 1054-56, 71 L. Ed. 2d 127 (1982) (internal quotes omitted)). Moreover, the court determined that "the peyote exemption is uniquely supported by the legislative history and congressional findings underlying the American Indian Religious Freedom Act." *See also Olsen v. Iowa*, 808 F.2d 652 (8th Cir. 1986) (affirming Iowa Supreme Court's holding that exemption for Native American Church's ceremonial use of peyote applied only to controlled and isolated circumstances, in contrast to Coptic Church members' continuous and public use of marijuana regardless of age or occupation).

Some cases have ruled one step further, holding that the use of peyote is outweighed by compelling state interests. *See e.g., United States v. Warner*, 595 F. Supp. 595 (D. N.D. 1984) (government's interest in prohibiting use of peyote is compelling and overrides defendant's free exercise rights); *cf., Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210 (5th Cir. 1991) (under less stringent standard of *Employment Div. v. Smith*, 494 U.S. 872, federal and state statute prohibiting peyote possession did not offend free exercise clause).

injury); *Kuch*, 288 F. Supp. at 448 (practice of beliefs must give way to the public good).

## II. Unwitting Possession

 Unwitting possession is a judicially created affirmative defense that may excuse the defendant's behavior, notwithstanding the defendant's violation of the letter of the statute. *State v. Knapp*, 54 Wn. App. 314, 317-18, 773 P.2d 134, *review denied*, 113 Wn.2d 1022 (1989). To establish the defense, the defendant must prove, by a preponderance of the evidence, that his or her possession of the unlawful substance was unwitting. *State v. Riker*, 123 Wn.2d 351, 368, 869 P.2d 43 (1994); *State v. Wiley*, 79 Wn. App. 117, 900 P.2d 1116 (1995).

Here, contrary to the foregoing rule, the trial court relied on *State v. Hundley*, 72 Wn. App. 746, 866 P.2d 56 (1994), *aff'd on other grounds*, 126 Wn.2d 418, 895 P.2d 403 (1995), and gave the following jury instruction regarding unwitting possession:

> A person is not guilty of possession of a controlled substance if the possession is unwitting. Possession of a controlled substance is unwitting if a person did not know that the substance was in his possession.
>
> The burden is on the plaintiff to disprove the defense of unwitting possession beyond a reasonable doubt.

In *Hundley*, the Court of Appeals held that a defendant must establish an affirmative defense only to the extent necessary to create a reasonable doubt as to his or her guilt. *Id.* at 751. On review, however, the Supreme Court noted that the Court of Appeals' decision predated *Riker*, 123 Wn.2d 351, and doubted the validity of the rule applied by the Court of Appeals. *Hundley*, 126 Wn.2d at 419.

In *Riker*, the Supreme Court considered the required burden of proof to establish a duress defense. Holding that a defendant bore the burden to establish duress by a preponderance of the evidence, the Court stated that

"[g]enerally, an affirmative defense which does not negate an element of the crime charged, but only excuses the conduct, should be proved by a preponderance of the evidence." *Riker*, 123 Wn.2d at 368. The court specifically disapproved and declined to follow cases requiring a lower standard.

Construing *Riker*, the court in *State v. Wiley*, 79 Wn. App. 117, 900 P.2d 1116 (1995) declined to follow the Court of Appeals in *Hundley*, and instead held that the defendant bore the burden to establish the defense of unwitting possession by a preponderance of the evidence. *Wiley*, 79 Wn. App. at 122-23.

In light of *Riker* and *Wiley*, the trial court erred here in two respects. First, the trial court improperly placed the burden to disprove unwitting possession upon the State when instead the burden of proof rested with Balzer. Second, the court incorrectly stated that the applicable standard of proof was beyond a reasonable doubt when the appropriate standard is proof by a preponderance of the evidence. As such, the trial court's instruction was erroneous. The proper standard is that set forth in *Wiley*. *Accord State v. Chapin*, 75 Wn. App. 460, 471-72, 879 P.2d 300 (1994), *review denied*, 125 Wn.2d 1024 (1995) (under *Riker*, holding that defendant has burden to establish affirmative defense of entrapment by preponderance of the evidence since such defense did not negate an element of the crime charged); *see also Knapp*, 54 Wn. App. at 320-22 (holding that affirmative defense of unwitting possession be proved by preponderance of evidence).

Reversed and remanded.

BRIDGEWATER and ARMSTRONG, JJ., concur.

Review denied at 136 Wn.2d 1022 (1998).